# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| E. HANLIN BAVELY, CHAPTER 7 | § | |
| TRUSTEE OF AAA SPORTS, INC., | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No.  4:22-cv-00093 |
| v. | § | Judge Mazzant |
| | § | |
| PANINI AMERICA, INC., | § | |
| *Defendant.* | § | |

## **AMENDED ORDER**[1]

Pending before the Court are Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing (1) Lack of Standing, (2) Abandonment and Waiver, and (3) No Damages (Dkt. #110), Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing Alleged Copyright Infringement (Dkt. #111), Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing Plaintiff's Count Two, the DMCA Claims (Dkt. #112), Plaintiff's Motion for Partial Summary Judgment Regarding Plaintiff's Standing (Dkt. #115), and Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Affirmative Defenses (Dkt. #116).  Having considered the motions and the relevant pleadings, the Court finds that Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing (1) Lack of Standing, (2) Abandonment and Waiver, and (3) No Damages (Dkt. #110) should be **DENIED**, Defendant Panini America, Inc's Motion for Summary Judgment Number Two: Addressing Alleged Copyright Infringement (Dkt. #111) should be **DENIED**; Defendant Panini America, Inc's Motion for Summary Judgment Number Three:

---

[1] The Court is amending its previous order on the parties' motions for summary judgment pursuant to Federal Rule of Civil Procedure 60(a).  In the Court's original order, it made a clerical mistake by omitting the word "not" in the second to last sentence of the second to last paragraph on page thirty-eight.  Originally, the sentence read as "Importantly, though, this does mean that the phrase "Stat Smashers"  is  protected."  Now, the sentence reads as "Importantly, though, this does not mean that the phrase "Stat Smashers"  is  protected."

Addressing Plaintiff's Count Two, the DMCA Claims (Dkt. #112) should be **DENIED**, Plaintiff's Motion for Partial Summary Judgment Regarding Plaintiff's Standing (Dkt. #115) should be **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Affirmative Defenses (Dkt. #116) should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This lawsuit stems from Defendant's use of intellectual property allegedly owned by AAA Sports, Inc. ("AAA Sports") in the 1990s.  On February 10, 2022, Plaintiff E. Hanlin Bavely, Chapter 7 Trustee of AAA Sports, Inc. (the "Trustee"), filed a lawsuit on behalf of AAA Sports' bankruptcy estate against Defendant Panini America, Inc. (Dkt. #1).  The Trustee alleges that, before filing for bankruptcy, AAA Sports owned copyrights for 166 cards it created, authored, published, sold, and distributed (Dkt. #1 at ¶ 24).  According to the Trustee, in 2020, Defendant released a collection of cards that included AAA Sports' copyrighted works.  The Trustee argues that Defendant has and continues to infringe on the copyrights by reproducing, distributing, adapting, and publicly displaying the copyrighted and derivative works based on those copyrights (Dkt. #1 at p. 1).  In addition, the Trustee accuses Defendant of distributing false copyright management information ("CMI") relating to the copyrights and intentionally removing or altering the CMI to conceal its infringement (Dkt. #1).  Accordingly, the Trustee brings causes of action under §§ 501–505 of the Copyright Act and §§ 1201–1203 of the Digital Millennium Copyright Act (the "DMCA") (Dkt. #1).

## I.     AAA Sports, Inc.

AAA Sports was a small sports collectible marketing and distributing company founded in 1986 by the Atkins family that did business as Wild Card (Dkt. #117, Exhibit 1 at pp. 4–5, 7). Initially, AAA Sports only displayed and supplied sports cards to publishers at card shows, but it

expanded into new markets several times as the business grew (Dkt. #117, Exhibit 1 at p. 4). First, AAA Sports expanded into a retail card shop (Dkt. #117, Exhibit 1 at p. 4). It then expanded again to add a wholesale division that supplied cards, posters, and card supplies to retail card shops (Dkt. #117, Exhibit 1 at p. 4). Finally, five years after its inception in 1991, AAA Sports expanded for a final time and began manufacturing and distributing sports trading cards (Dkt. #117, Exhibit 1 at pp. 7–8).

### A.  The Copyrighted Works

In 1992, after the success of the first set of trading cards, AAA Sports introduced the Stat Smashers series under its "Wild Card" brand (Dkt. #117, Exhibit 1 at p. 25). The Wild Card Stat Smashers series is a set of card inserts of high-achieving football players—or players that "smash the stats"—that AAA Sports randomly inserted into its sports trading card packs (Dkt. #130, Exhibit 3 at pp. 4–5). In 1993, AAA Sports released another Wild Card Stat Smashers series (Dkt. #117, Exhibit 1 at p. 25). This second Wild Card Stat Smashers series set had the same layout, design, and color scheme as the first one. The Wild Card Stat Smashers series were designed by employees on the product development team of AAA Sports (Dkt. #117, Exhibit 1 at pp. 23–24). Specifically, Diane Cartheuser ("Cartheuser") designed the Stat Smashers Logo and the cards in the Wild Card Stat Smashers series (Dkt. #117, Exhibit 1 at p. 23; Dkt. #117, Exhibit 4 at pp. 6–7).

AAA Sports did not submit copyright applications for the Wild Card Stat Smashers trading cards series with the Copyright Office at the time it created the trading cards. The seven copyrights at issue were not registered until the beginning of 2022 (Dkt. #117, Exhibits 8–14). AAA Sports submitted copyright registration applications for seven trading cards in January of 2022,[2]

---

[2] Neither party takes issue with AAA Sports registering the Copyrights rather than the Trustee registering the Copyrights on behalf of the Estate.

signifying that it created six of the copyrighted cards in 1992 and one of the copyrighted cards in 1993 before it went into bankruptcy. *See* (Dkt. #117, Exhibits 8–14). The copyright applications were approved on February 1, 2022, and the copyrights are considered effective as of January 13, 2022 (Dkt. #117, Exhibits 8–14). The registered copyrighted works are as follows:

1. The 1992 Barry Sanders Stat Smashers Card, which is registered as VA0002285039 ("Registration '039") and titled "Wild Card," "Stat Smashers," and "Barry Sanders" (Dkt. #117, Exhibits 7, 8);

2. The 1992 Deion Sanders Stat Smashers Card, which is registered as VA0002285035 ("Registration '035") and titled "Wild Card," "Stat Smashers," and "Deion Sanders" (Dkt. #117, Exhibit 9);

3. The 1992 Emmitt Smith Stat Smashers Card, which is registered as VA0002285030 ("Registration '030") and titled "Wild Card," "Stat Smashers," and "Emmitt Smith" (Dkt. #117, Exhibit 10);

4. The 1992 Jerry Rice Stat Smashers Card, which is registered as VA0002285026 ("Registration '026") and titled "Wild Card," "Stat Smashers," and "Jerry Rice" (Dkt. #117, Exhibit 11);

5. The 1992 Joe Montana Stat Smashers Card, which is registered as VA0002285025 ("Registration '025") and titled "Wild Card," "Stat Smashers," and "Joe Montana" (Dkt. #117, Exhibit 12);

6. The 1993 Joe Montana Stat Smashers Card, which is registered as VA0002285023 ("Registration '023") and titled "Wild Card," "Stat Smashers," and "Joe Montana 93" (Dkt. #117, Exhibit 13);

7. The 1992 Steve Young Stat Smashers Card, registered as VA0002285020 ("Registration '020" or "Stat Smashers Copyright" or "Stat Smashers Logo") and titled "Wild Card," "Stat Smashers," and "Steve Young" (Dkt. #117, Exhibit 14)

(collectively, the "Copyrights").  Importantly, aside from the Stat Smashers Copyright, the new materials included in the copyright for Registrations '039, '035, '030, '026, '025, and '023 are the 2-D artwork and the text on the cards (collectively, the "Art and Text Copyrights") (Dkt. #117, Exhibits 8–13).  As to Registration '020, or the Stat Smashers Copyright, the new material included in the copyright is in the Stat Smashers Logo (Dkt. #117, Exhibit 14).  All of the Copyrights specifically note that the material excluded from the Copyrights are the NFL team logos, NFL team names, NFL team uniforms, athlete names, the player photo and headshot, athlete statistics, the Team NFL logo, The National Football League Players Association logo, and the Wild Card logo (Dkt. #117, Exhibits 8–14).  The Stat Smashers Logo is excluded from all the Copyrights except the Stat Smashers Copyright (Dkt. #117, Exhibits 8–14).  Notably, although not registered in the 1990s when they were created and first published, each of the cards created, manufactured, and distributed for sale by AAA Sports contain a copyright notice on the bottom of the back of the cards.  *E.g.,* (Dkt. #117, Exhibit 7).

**B.  AAA Sports' Bankruptcy Proceedings**

On February 25, 1994, AAA Sports filed a Chapter 11 petition for bankruptcy—*In re AAA Sports, Inc. d/b/a Wildcard*, Case No. 94-cv-10684 (Bankr. S.D. Ohio filed Feb. 25, 1994) (Dkt. 117, Exhibit 9).  The bankruptcy case was later converted from a Chapter 11 bankruptcy case to a Chapter 7 bankruptcy (Dkt. #117, Exhibit 3 at p. 6).  After the case was converted to a Chapter 7 bankruptcy case, the Trustee was appointed as the trustee of AAA Sports' bankruptcy estate (the "Estate") (Dkt. #117, Exhibit 14).

5

Attached to AAA Sports' bankruptcy petition were its Schedules of Assets and Liabilities (the "Schedules") (Dkt. #117, Exhibit 19).  Relevant here, question twenty-one of Schedule B required AAA Sports to list its patents, copyrights, and other intellectual property (Dkt. #117, Exhibit 19 at p. 4).  AAA Sports did not list any patents, copyrights, or other intellectual property in response to question twenty-one (Dkt. #117, Exhibit 19 at p. 4).  In other words, AAA Sports did not list the Copyrights in the Schedules.  *See* (Dkt. #117, Exhibit 19 at p. 4).  Given that AAA Sports did not list the Copyrights in the Schedules, the Trustee was unaware of the Copyrights and did not administer them.  On October 2, 2000, the bankruptcy court entered an order discharging the Trustee after the Trustee completed the liquidation of the scheduled assets, which did not include the Copyrights.  *See* (Dkt. #117, Exhibit 21 at p. 2).  On that same day, the Chapter 7 bankruptcy case was closed (Dkt. #117, Exhibit 21 at p. 2).

Nearly twenty years later, at the beginning of September 2021, the Trustee learned that AAA Sports still had unscheduled and unadministered assets, i.e., the Copyrights (Dkt. #117, Exhibit 16 at pp. 6–8).  The United States Trustee said that he was made aware by the Trustee that there were assets of the Estate that had not previously been administered and needed to be administered now (Dkt. #117, Exhibit 50 at p. 2).  On September 22, 2021, the Office of the United States Trustee filed a motion to reopen the Chapter 7 bankruptcy case, which was granted by the bankruptcy court on October 20, 2021 (Dkt. #117, Exhibit 50 at p. 2; Dkt. #117, Exhibit 51 at p. 2).  On October 26, 2021, the Trustee was reappointed as the trustee of the Estate (Dkt. #117, Exhibit 3 at p. 6; Dkt. #117, Exhibit 16 at pp. 12–13).

### C.  AAA Sports' Trademarks

AAA Sports filed for a number of trademarks in 1991, including the phrase Wild Card and the Wild Card logo ("AAA Sports Trademarks") (Dkt. #113, Exhibit 74 at pp. 10, 21, 24).  On

July 2, 1993, AAA Sports abandoned the trademark for the phrase Wild Card (Dkt. #113, Exhibit 74 at pp. 10, 21).  And, on February 7, 1994, right before entering into bankruptcy, AAA Sports abandoned the Wild Card logo trademark (Dkt. #113, Exhibit 74 at pp. 10, 24).  AAA Sports did not file any trademark application for the phrase Stat Smashers or for the Stat Smashers Logo (Dkt. #113, Exhibit 74 at p. 10).

## II.   Defendant Panini America, Inc. and Its Sports Trading Cards

Panini America, Inc., Defendant in this case, was founded in 2009 (Dkt. #113, Exhibit 73 at p. 1).  Defendant manufactures sports trading cards, including a collection called Certified Football (Dkt. #113, Exhibit 73 at p. 1).  In 2020, Defendant decided to include what it dubs a retro callback card set in its Certified Football collection that "called back" to the Wild Card Stat Smashers series created by AAA Sports in the 1990s (Dkt. #113, Exhibit 57 at p. 7; Dkt. #113, Exhibit 73 at pp. 3–4).  Before creating its version of the Stat Smashers card series, Defendant checked the United States Patent and Trademark Office to determine whether AAA Sports still had trademarks (Dkt. #113, Exhibit 58 at p. 7).  Defendant also checked to see that AAA Sports had gone bankrupt in the 1990s and was no longer in business (Dkt. #113, Exhibit 58 at p. 7).  After determining that there were no active trademarks from AAA Sports and checking the status of AAA Sports as a currently existing entity, Defendant proceeded with creating, producing, and selling the Stat Smashers "call back" cards (Dkt. #113, Exhibit 58 at p. 7).

The 2020 callback cards were replicas of the Stat Smashers cards that AAA Sports created in the 1990s and included physical and digital copies of the trading cards (Dkt. #117, Exhibit 28 at p. 5; Dkt. #117, Exhibit 37 at p. 4; Dkt. #113, Exhibit 76).  The digital copies were the same or similar in design to the physical cards but had a "Blitz" logo attached to them (Dkt. #113, Exhibit 43).  In August of 2020, Defendant released the cards (Dkt. #113, Exhibit 73 at pp. 1–2).  Because

of Defendant's release of Stat Smashers call back cards in 2020, Trustee accuses Defendant of making unauthorized copies of the Copyrights in various forms, including the physical trading cards, digital trading cards, printing plates, and other printed publications (collectively, the "2020 Cards") (Dkt. #1 at ¶¶ 52–91; Dkt. #113, Exhibit 76).

In 2021, Defendant decided to put another Stat Smashers "call back" card set in its Certified Football collection (Dkt. #113, Exhibit 63 at p. 7).  When making the 2021 Cards, Defendant changed the design from the previous year (Dkt. #117, Exhibit 28 at p. 8; Dkt. #117, Exhibit 46; Dkt. #113, Exhibit 73 at p. 4).  The 2021 callback cards also included physical and digital copies of the trading cards (Dkt. #113, Exhibit 76).  The digital copies were, again, the same or similar in design to the physical cards but had a "Blitz" logo attached to them.  The 2021 Cards were released in August of 2021 (Dkt. #113, Exhibit 63 at p. 7; Dkt. #117, Exhibit 37 at p. 4).  For the same reasons the Trustee accuses Defendant of copyright infringement with respect to the 2020 Cards, the Trustee accuses Defendant of making unauthorized copies of the Copyrights in various forms because of its release of the second Stat Smashers card set in 2021, including the physical trading cards, digital trading cards, printing plates, and other printed publications (collectively, the "2021 Cards") (Dkt. #1 at ¶¶ 52–91; Dkt. #113, Exhibit 76).

In total, the Trustee accuses six of Defendant's works related to the 2020 and 2021 Cards of infringing on the Copyrights, either as copies or derivative works of the Copyrights:

1. The physical Stat Smashers card sets included in Defendant's 2020 trading card set ("2020 Physical Cards");

2. The digital versions of the 2020 Physical Cards ("2020 Digital Cards");

3. The physical printing plates used to print Defendant's 2020 Physical Cards ("2020 Printing Plates");

4. The physical and digital publications featuring the 2020 Physical Cards ("2020 Publications");

5. The physical Stat Smashers card sets in Defendant's 2021 trading card set ("2021 Physical Cards"); and

6. The digital versions of the 2021 Physical Cards ("2021 Digital Cards").

(Dkt. #1 at ¶¶ 52–91; Dkt. 113, Exhibit 76) (collectively, the "Infringing Works").

## III.   Use of the Copyright by Third Parties to this Case

On January 1, 2021, one of the founders of AAA Sports, Daniel Atkins, formed a new entity named Wild Card, Inc. ("WC") (Dkt. #117, Exhibit 28 at p. 20).  Daniel Atkins opened WC with the help of his family, many of whom were also part of the founding of AAA Sports (Dkt. #113, Exhibit 29 at pp. 10–14).  The current owners of WC include Ty Atkins, Daniels Atkins, and Taylor Atkins (Dkt. #130, Exhibit 9 at p. 3).  WC is a new and separate entity from AAA Sports (Dkt. #113, Exhibit 29 at pp. 12–13).

After creating WC, Daniel Atkins applied for a trademark in the original Wild Card logo design and the phrase Wild Card (Dkt. #113, Exhibit 25 at p. 2).  On June 15, 2021, the United States Patent and Trademark Office granted Daniel Atkins a trademark in the phrase and logo Wild Card ("Wild Card Trademarks") (Dkt. #113, Exhibit 25 at p. 2).  Daniel Atkins now uses the Wild Card Trademarks in WC's sports trading cards, specifically, its 2021 Matte Football collection (Dkt. #130, Exhibit 9 at p. 13; Dkt. #130, Exhibit 9 at pp. 5–6, 8).  The products from the WC 2021 Matte Football collection include a base card, Weekend Warrior, X-Plode, and Red Hot Rookie cards (Dkt. #130, Exhibit 9 at p. 5).

WC also planned to develop a new set of Stat Smashers cards to be released in 2021 as part of WC's 2021 Matte Football products (Dkt. #117, Exhibit 60 at pp. 4, 6).  In pursuit of creating

the new Stat Smasher cards, WC hired MJ Kretsinger as the designer for the new Stat Smasher cards (Dkt. #130, Exhibit 9 at p. 8).  WC showed Kretsinger an original Stat Smashers card from AAA Sports and asked if he could reproduce a similar card effect, look, and feel (Dkt. #113, Exhibit 48 at p. 14).  However, WC decided not to move forward with selling a new set of Stat Smashers cards and did not ever print, produce, or release any Stat Smasher cards for sale (Dkt. #117, Exhibit 60 at pp. 4–5; Dkt. #130, Exhibit 9 at p. 8).  Instead, WC created the Weekend Warrior cards in place of the Stat Smasher cards (Dkt. #130, Exhibit 9 at pp. 9–10).  Before deciding not to make the new set of Stat Smashers cards, WC released a set of promotional materials for its 2021 Matte Football products that contained pictures of the new Stat Smashers cards from WC (Dkt. #113, Exhibit 29 at pp. 15–16).  Because WC decided not to sell Stat Smashers cards, though, they were ultimately not included in the 2021 Matte Football products (Dkt. #130, Exhibit 9, 11–12).  After switching out the card sets, WC released a new flyer that contained the Weekend Warrior cards and left off the Stat Smasher cards (Dkt. #130, Exhibit 9 at pp. 11–12).

## IV.    The Current Litigation and Motions

As mentioned, the Trustee learned that AAA Sports still had unscheduled and unadministered assets (Dkt. #117, Exhibit 16 at pp. 6–8).  Accordingly, the Trustee took steps to reopen bankruptcy proceedings so that those assets could be administered (Dkt. #117, Exhibit 50 at p. 2; Dkt. #117, Exhibit 51 at p. 2; Dkt. #117, Exhibit 3 at p. 6; Dkt. #117, Exhibit 16 at pp. 12–13).  On November 20, 2021, after the bankruptcy case was reopened and the Trustee was reappointed, the Trustee filed an application with the bankruptcy court to Employ and Retain Cole Schotz P.C. as Special Litigation Counsel to Prosecute Certain Intellectual Property Claims, i.e., to file suit against Defendant for violations of the Copyright Act and the DMCA related to the

10

Copyrights (Dkt. #117, Exhibit 52).  On December 28, 2021, the bankruptcy court authorized the Trustee to employ and retain Cole Schotz, P.C. as counsel (Dkt. #117, Exhibit 53).  On February 10, 2022, The Trustee filed suit on behalf of the Estate against Defendant for violations of the Copyright Act and the DMCA (Dkt. #1).

On February 20, 2023, Defendant filed three motions for summary judgment (Dkt. #110; Dkt. #111; Dkt. #112).  On March 21, 2023, the Trustee filed his responses to the motions (Dkt. #127; Dkt. #128; Dkt. #129).  On March 28, 2023, Defendant filed its reply briefs (Dkt. #135; Dkt. #136; Dkt. #137).  On April 4, 2023, the Trustee filed his sur-reply briefs (Dkt. #142; Dkt. #143; Dkt. #144).

On February 21, 2023, the Trustee filed two motions for summary judgment (Dkt. #115; Dkt. #116).  On March 21, 2023, Defendant filed its responses to the motions (Dkt. #123; Dkt. #124).  On March 28, 2023, the Trustee filed his reply briefs (Dkt. #132; Dkt. #133).  On April 4, 2023, Defendant filed its sur-reply briefs (Dkt. #148; Dkt. #149).

### LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the Court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

The parties to this case filed five competing motions for summary judgment on various issues: Defendant filed three motions for summary judgment (Dkt. #110; Dkt. #111; Dkt. #112), and the Trustee filed two motions for summary judgment (Dkt. #115; Dkt. #116).  Defendant and the Trustee's motions for summary judgment largely cover the same issues, and the arguments contained within overlap substantially.  At a high level, the parties ask the Court to determine whether the Trustee has constitutional standing, whether the Trustee's Copyright Act and DMCA causes of action should be dismissed as a matter of law, whether there is sufficient evidence to support the Estate's copyright infringement damages, and whether several of Defendant's affirmative defenses should be dismissed as a matter of law.  Because the substance of the motions substantially overlaps, the Court considers all the arguments and briefing together.

## I.    Evidentiary Objections

Before beginning its substantive analysis regarding the parties' motions for summary judgment, the Court must address some evidentiary issues raised by the parties.

### A. The Trustee Requests that the Court Strike the Deposition of Defendant's Corporate Representative

In his response to Defendant's first motion for summary judgment, the Trustee asks this Court to strike the affidavit of Robert Springs ("Springs"), Defendant's corporate representative (Dkt. #127 at pp. 11–12; Dkt. #113, Exhibit 73).  The Trustee argues that the Court should strike the affidavit because it is an attempt to skirt the Court's page limit restriction and is a sham affidavit.  According to the Trustee, the affidavit injects personal and unsubstantiated opinions into the record, and Defendant is using the affidavit to create facts issues.  Defendant argues that the affidavit is not a sham because it is consistent with Springs's prior testimony and with the testimony of Defendant's other employees.

13

The sham affidavit doctrine allows a district court to "refuse to consider statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'" *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) (citing *Clark v. Resistoflex Co., A Div. of Unidynamics Corp.*, 854 F.2d 762, 766 (5th Cir. 1988); *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (stating that the sham affidavit rule is only appropriate where an affidavit "directly contradicts" prior testimony); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (finding that the sham affidavit rule was inappropriate because the affidavit was not "inherently inconsistent" with prior testimony)).  The affidavit must directly contradict prior testimony; therefore, not "'every discrepancy' in an affidavit justifies a district court's refusal to give credence to competent summary judgment evidence." *Id.* (citing *Kennett-Murray*, 622 F.2d at 893).  Instead, "in considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier statement." *Id.* (cleaned up).  "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made" earlier. *Id.*

The Court disagrees that Springs's affidavit is so markedly inconsistent and directly contradictory that it is a sham.  The Trustee is simply nitpicking slight changes in phrasing or word choice between Springs's affidavit and his deposition testimony.  There is nothing inherently inconsistent between Springs's affidavit, Springs's deposition testimony, or the rest of the summary judgment evidence presented by Defendant.  Even if there are some slight inconsistencies, those inconsistencies, at most, create a credibility issue for Springs's version of the facts.  Such credibility determinations, however, are for the jury, not the district court.  *See Kennett-Murray*, 622 F.2d at 894.  Accordingly, the Court will not strike Springs's affidavit.

**B.  The Trustee Objects to Defendant's Expert Report from Juli Saitz**

The Trustee argues that the expert report of Juli Saitz (the "Saitz Report") was not fully disclosed and that Defendant's assertions about the opinions contained within are false, unreasonable, and vexatious (Dkt. #156).  In its objection, Defendant merely notes its complaints about the Saitz Report.  Defendant does not seek any relief from the Court regarding its complaints about the Saitz Report.  Accordingly, the Court need not consider these objections.

**C.  The Trustee Objects to Defendant's Expert Report from Daniel Wulkan**

The Trustee also argues that the expert report of Daniel Wulkan (the "Wulkan Report") should not be considered by the Court because Wulkan was not disclosed as a fact witness, the report contains inadmissible hearsay, the report is *ipse dixit*, and it contradicts Defendant's sworn testimony (Dkt. #132 at pp. 4–5).  Defendant argues that the Wulkan Report is a properly and timely disclosed expert witness report and that Wulkan is qualified to testify as an expert witness. Defendant further argues that the report is not *ipse dixit* and that the Wulkan Report is not contradictory.  More to the point, Defendant argues that the Wulkan Report is proper summary judgment evidence and that the Trustee's arguments go to weight, not admissibility.  The Court agrees with Defendant.

Under Rule 56 of the Federal Rules of Civil Procedure, when a party asserts a fact is genuinely disputed, he must support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  FED. R. CIV. P. 56(c)(1)(A).  "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, the material may be presented in a form that would not, in itself, be admissible at trial."  *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (cleaned

up) (citations omitted).  And the party submitting the evidence must show it "will be possible to put the information into an admissible form."  *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 522 (5th Cir. 2021).

The Trustee's objections go to the weight the Court should give the Wulkan Report, not whether it is possible for Defendant to put the Wulkan Report into an admissible form.  Because Defendant designated Wulkan as a testifying expert witness, the Wulkan Report would be admissible by way of Wulkan's testimony during trial.  FED. R. CIV. P. 702.  In addition, the materials relied on by Wulkan—i.e., the materials that the Trustee objects to as hearsay—do not need to be admissible for Wulkan to have relied on them so long as those materials are of a type reasonably relied upon by experts in that particular field when forming opinions or inferences.  FED. R. CIV. P. 703.  Moreover, although the Trustee argues that the Wulkan Report is *ipse dixit*, the Trustee offers no argument aside from one conclusory sentence.  So, without more, the Court need not consider that argument.  Additionally, the Trustee's argument regarding conflicting testimony is a fact issue for the jury to resolve.  Accordingly, the Wulkan Report is properly before this Court under Rule 56.

Now that the Court has resolved the parties' evidentiary disputes, the Court turns to Defendant's argument that the Trustee does not have constitutional standing to bring suit on behalf of the Estate.

## II.   Constitutional Standing

A party bringing suit must have constitutional standing to bring said suit.  The "judicial Power of the United States" extends only to "Cases" and "Controversies."  U.S. CONST. art. III, §§ 1–2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or

16

controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); *cf. Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)) (stating that "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'").  The doctrine of standing is "rooted in the traditional understanding of a case or controversy," and it "limits the category of litigants empowered to maintain a lawsuit in federal court . . . ." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

To establish standing, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision.  *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Supreme Court of the United States has clarified that constitutional standing is limited to this analysis of "Article III's limitation of the judicial power to resolv[e] 'Cases' and 'Controversies.'" *Lexmark*, 572 U.S. 118, 125 (2014).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

Defendant filed a motion for summary judgment regarding whether the Trustee has constitutional standing.  Defendant does not dispute the second two elements.  The only element that Defendant argues the Trustee cannot prove is that the Estate suffered an injury.  Encompassed in this argument is whether the Trustee abandoned the Copyrights during the original bankruptcy proceedings, for which the parties filed competing motions for summary judgment.

Since the filing of the summary judgment motions, the Court ruled on the issues of abandonment and constitutional standing during the bankruptcy proceedings in its order on Defendant's motion for judgment on the pleadings (Dkt. #189).  The Court determined that (1) the

Trustee did not abandon the Estate's Copyrights, and (2) the Estate had suffered an injury-in-fact (Dkt. #189 at pp. 14, 20).  Thus, the Court concluded that the Trustee does have constitutional standing to bring suit on behalf of the Estate (Dkt. #189).  Although "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," the Court looked beyond just the pleadings.  *Lujan*, 504 U.S. at 561.  To reach the conclusion that there was standing, the Court took judicial notice of and reviewed documents and facts beyond the pleadings.[3]  The arguments and facts before the Court in Defendant's motion for summary judgment are similar to the facts and arguments before the Court in Defendant's motion for judgment on the pleadings on this issue.  With that in mind, and for the following reasons, the Court's opinion is unchanged.

Defendant spends the majority of its constitutional standing brief arguing that the Trustee cannot prove damages.  According to Defendant, because it believes the Estate cannot prove damages, the Estate did not suffer an injury-in-fact.[4]  Thus, Defendant argues that there is no constitutional standing, and the Court should dismiss the case.  Any argument by Defendant that the Trustee does not have constitutional standing because he cannot sufficiently prove damages is misplaced.  Standing does not turn on whether a plaintiff can prove damages at trial.  Rather, "[t]o establish injury-in-fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  A plaintiff is not required to present evidence of and definitively establish that he or she can recover his or her

---

[3] The Court referenced three documents outside the Complaint in order to determine the Trustee's standing: (1) the United States Trustee's motion to reopen the bankruptcy proceeding (Dkt. #33, Exhibit 8); (2) the bankruptcy court's order granting the motion (Dkt. #33, Exhibit 9); and (3) AAA Sports' voluntary petition for bankruptcy (Dkt. #33, Exhibit 11).

[4] Defendant also argues that AAA Sports does not have standing to bring suit because it did not suffer an injury.  AAA Sports is not the owner of the Copyrights and is not a party to this suit.  Accordingly, it is irrelevant whether AAA Sports has standing to sue.

requested damages.  *See it.*  Defendant provides no caselaw in support of this proposition, and the Court can find none.  Whether the Trustee can sufficiently prove and recover damages based on the alleged infringement of AAA Sports' bankruptcy estate's copyrights by Defendant is an issue of material fact that must be determined by a jury.  Thus, the Court need not determine whether the Estate can prove damages in order to determine whether the Estate has suffered an injury.

After rejecting Defendant's damages argument, the only remaining argument from Defendant is that the Trustee cannot prove the Estate suffered a concrete injury.  The Court disagrees.  The Trustee is suing Defendant on behalf of the Estate for violations of the Copyright Act and the DMCA.  "Section 501(b) of the Copyright Act establishes who may sue for copyright infringement: 'the legal or beneficial owner of an exclusive right under a copyright.'"  *See Stross v. Redfin Corp.*, 730 F. App'x 198, 203 (5th Cir. 2018) (quoting 17 U.S.C. § 501(b)); *Patterson v. Rawlings*, 287 F. Supp. 3d 632, 638 (N.D. Tex. 2018).  And, under the DMCA, § 1203(a) provides a cause of action to any person injured by a violation of §§ 1201 or 1202.  17 U.S.C. § 1203(a), (c).  So first, the Court must determine whether there is evidence that establishes the Estate is the owner of the Copyrights.[5]  It is at this junction that the issue of abandonment during the bankruptcy proceedings is relevant.

---

[5] The Court notes that, in some ways, this is a case of first impression.  The facts of this case are not the typical facts that give rise to a bankruptcy trustee bringing suit for a cause of action owned by the bankruptcy estate.  The Court is unaware of any situation where a copyright became the property of a bankruptcy estate and then decades later, while the copyright was still part of the estate (but unscheduled and unadministered), a third party began infringing on those copyrights causing the claim to accrue while the copyrights were still owned by the estate.  However, a bankruptcy estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . . [which] sweeps into the [] estate all interests held by the debtor—even future, non-possessory, contingent, speculative, and derivative interests."  *In re McLain*, 516 F.3d 301, 312 (5th Cir. 2008) (citations omitted).  With this in mind, and for the reasons set out in the Court's order, it is apparent that when one combines copyright and bankruptcy principles, there is only one outcome: the Estate owns the Copyrights, and the Trustee is the only individual who has standing to bring suit.

### A.  Whether the Trustee Abandoned the Copyrights During the Original Bankruptcy Proceedings

If the Trustee abandoned the Copyrights, then the Copyrights are the property of AAA Sports, not the Estate.  If, on the other hand, the Trustee did not abandon the Copyrights, then they remain the property of the Estate, and the Estate is the owner of the Copyrights.  Here, the Court concludes that the Trustee did not abandon the Copyrights.  Thus, the Copyrights are still the property of the Estate, and the Estate is the owner for purposes of the Copyright Act and the DMCA.

Upon the filing of bankruptcy, § 541(a)(1) creates a bankruptcy estate "that consists of 'all legal or equitable interest of the debtor in property as of the commencement of the case.'"  *Matter of Swift*, 129 F.3d 792, 795 (5th Cir. 1997) (quoting 11 U.S.C. § 541(a)(1)).  Therefore, a bankruptcy trustee, "as the representative of the bankruptcy estate, is the real party in interest, and is the only party who has standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed."  *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (citing 11 U.S.C. §§ 323, 541(a)(1)); *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 306 (5th Cir. 2001)).  However, it is the debtor that is "under a continuing duty to disclose all pending and potential claims" and assets.  *See id.* (citing 11 U.S.C. § 521(1); *In re Coastal Plains, Inc.*, 179 F.3d 197, 207–08 (5th Cir. 1999)).

If a debtor fails to schedule an asset and the bankruptcy trustee later discovers it, the bankruptcy court may reopen the case to allow the trustee to administer the asset on behalf of the debtor's creditors.  *Id.* (citing 11 U.S.C. § 350(b)).  However, a bankruptcy court will not reopen a case for that purpose if the bankruptcy estate's trustee abandoned the asset before closing the original bankruptcy case.  *See id.*  In this case, if AAA Sports owned the Copyrights, it was under a duty to schedule the Copyrights.  If AAA Sports scheduled the Copyrights, but the Trustee did

not administer them, then the Copyrights were deemed abandoned at the close of the original bankruptcy proceeding.  11 U.S.C. § 554(c).  On the other hand, if AAA Sports did not schedule the Copyrights and the Trustee did not administer them, then the Copyrights are not deemed abandoned and are still the property of the Estate.  11 U.S.C. § 554(d).  Thus, the Trustee must establish (1) AAA Sports owned the Copyrights when it filed for bankruptcy, (2) the Estate became the owner of the Copyrights upon AAA Sports filing for bankruptcy, (3) AAA Sports did not schedule the Copyrights, and (4) the Trustee did not administer the Copyrights.  If all four are established, then the Estate did not abandon the assets under § 554(d).

With respect to AAA Sports' initial ownership as it relates to constitutional standing, the evidence demonstrates that AAA Sports' employees created the Copyrights and, therefore, AAA Sports was the initial owner of the Copyrights.[6]  The Copyrights were designed by employees on AAA Sports' product development team (Dkt. #117, Exhibit 1 at pp. 23–24).  Specifically, there is evidence in the record that the Stat Smashers Logo and the Wild Card Stat Smashers card series—the Copyrights—were designed by Cartheuser, the Director of Creative Services at AAA Sports, through collaboration with other employees, as part of her job (Dkt. #113, Exhibit 40 at pp. 12–13; Dkt. #117, Exhibit 1 at p. 23, Exhibit 4 at pp. 6–7; Dkt. #130, Exhibit 28 at pp. 2–3).  Thus, AAA Sports' employees created the Copyrights as part of their employment with AAA Sports.  Under the work-for-hire doctrine, if an employee prepares a copyrightable work for his or her employer, the employer is the author of the work, not the employee.  17 U.S.C. § 201(b).  Thus, the evidence shows that AAA Sports was the owner of the Copyrights because AAA Sports' employees created the Copyrights for AAA Sports.  *Cmty. for Creative Non-Violence v. Reid*, 490

---

[6] Insofar as this analysis relates to the Court's ownership analysis with respect to the Trustee's claim of copyright infringement, the Court notes that it conducts a more in-depth analysis regarding whether the Estate is the owner of valid copyrights such that it may bring suit under the Copyright Act in the Court's analysis of the first element of a copyright infringement claim.

U.S. 730, 737 (1989) ("If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." (citing 17 U.S.C. § 201(b)).  Therefore, upon filing for bankruptcy, the Copyrights became the property of the Estate.  11 U.S.C. § 541(a)(1); *Matter of Swift*, 129 F.3d at 795.  Now, the Court turns to whether AAA Sports scheduled the assets and whether the Trustee administered the assets.

AAA Sports failed to list the Copyrights on its Schedules.  *See generally* (Dkt. #117, Exhibit 19).  Question twenty-one of part B of the Schedules asked AAA Sports to list, among other things, the Copyrights (Dkt. #117, Exhibit 19 at p. 4).  AAA Sports did not list the Copyrights in its bankruptcy schedule.  *See* (Dkt. #117, Exhibit 19 at p. 4).  Thus, the Copyrights were not scheduled.  In addition, there is no evidence that the Copyrights were ever administered.  The Trustee testified that he was not aware of the Copyrights until 2021 (Dkt. #117, Exhibit 16 at pp. 6–8).  Indeed, in 2021, the bankruptcy case was specifically reopened so that newly discovered assets, which were not administered during the original bankruptcy proceedings, could now be administered (Dkt. #117, Exhibit 16 at p. 3).  Accordingly, the Copyrights were neither scheduled nor administered.  Because AAA Sports owned the Copyrights when it filed for bankruptcy, but AAA Sports did not schedule the Copyrights, and the Trustee did not administer the Copyrights, the Trustee did not abandon the Copyrights.  11 U.S.C. § 554(d).  Thus, the Estate is still the owner of the Copyrights.

As the owner of the Copyrights and the entity harmed by violations of the Copyright Act and the DMCA, the Estate is authorized by statute to bring these causes of action.  *See* 17 U.S.C. §§ 501(b), 1203(a).  And, as the trustee of the Estate, the Trustee is the only individual who may bring a suit on the Estate's behalf.  *See, e.g., Kane*, 535 F.3d at 385 ("[A] trustee, as the

representative of the bankruptcy estate, is the real party in interest, and is the only party with standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed.").  Now that the Court has established that the Estate may bring claims under the Copyright Act and the DMCA and that the Trustee is the only individual who can bring suit on behalf of the Estate, the Court turns to whether the Estate's injury is concrete.

### B.  Whether the Estate's Injury is Concrete

As discussed, "[t]o establish injury-in-fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  An injury is "concrete" when it is "'real' and not 'abstract,'" meaning the plaintiff must have suffered an actual injury.  *Spokeo*, 578 U.S. at 339 (citation omitted).  "[W]ith respect to the concrete-harm requirement in particular, [the Supreme] Court's opinion in *Spokeo v. Robins* indicated that courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo*, 578 U.S. at 341).  A "concrete" injury is not necessarily a tangible injury.  *Spokeo*, 578 U.S. at 340 ("'Concrete' is not, however, necessarily synonymous with 'tangible.'  Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.").

The Estate's injury stems from another's use and distribution of the Copyrights that the Trustee claims bear false CMI and the removal of CMI from the Copyrights without the Estate's permission.  Specifically, the Trustee argues that the Estate was injured because Defendant's actions deprived it of an opportunity to earn profits from the Copyrights.  More specifically, according to the Trustee, Defendant's distribution of the 2020 and 2021 Cards into the public

domain and use of the Copyrights without compensation impaired the Trustee's ability to monetize the Copyrights on behalf of the Estate.  Thus, the Trustee contends that his inability to monetize the Copyrights on behalf of the Estate constitutes an injury.  To be sure, the Estate suffered an injury when Defendant infringed on the Estate's exclusive rights, actions which, by statute, serve as a basis for the Trustee to bring suit against Defendant on behalf of the Estate.  Accordingly, these injuries have a close relationship to harms that are explicitly recognized as a basis for a lawsuit in American courts.  *See* 17 U.S.C. §§ 504(a)–(c)(1), 1202, 1203; *see also MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010) ("Under 17 U.S.C. §§ 504(a)(1) and (b), a copyright owner is permitted to recover his own 'actual damages,' including lost profits and "reasonable royalty rates," or what a willing buyer would have been reasonably required to pay a willing seller as a licensing fee for the actual use of the copyrighted material by the infringers."); *Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, No. 19-CV-2953, 2020 WL 5739138, at *11 (S.D. Tex. Sept. 24, 2020) ("A person who violates § 1202 is subject to the civil remedies set forth in § 1203.").

The Estate suffered a concrete injury when another infringed on its exclusive rights under the Copyright Act or violated the DMCA.  Therefore, the Estate may recover statutory or actual damages.  The Trustee provided evidence that supports the Trustee's contention that the Defendant infringed on the Estate's exclusive rights and violated the DMCA.  Accordingly, the Trustee has presented evidence that would support the element of injury-in-fact.  *See Joe Hand Promotions, Inc. v. Del-Mar Lanes, Inc.*, No. 20-CV-466, 2021 WL 3832810, at *3 (S.D. Tex. May 7, 2021) ("The Court finds Joe Hand had exclusive rights in each of the [copyrights] at the time of the alleged infringement.  The Court finds Joe Hand has shown the existence of an injury in fact and the other elements of constitutional standing.").  The Estate had exclusive rights in each of the

24

Copyrights at the time of the alleged infringement. Therefore, the Trustee has standing to sue Defendant for violations of the Copyright Act and the DMCA on behalf of the Estate.

In conclusion, the Trustee established that the Copyrights were not abandoned during the original bankruptcy proceedings, and the Estate is entitled to summary judgment on that issue. However, the Trustee presented evidence that established he has constitutional standing to sue on behalf of the Estate; accordingly, Defendant is not entitled to summary judgment.

With the issue of constitutional standing disposed of, the Court moves on to Defendant's argument that the Estate's copyright infringement claim fails.

## III.  The Copyright Act

The Trustee accuses Defendant of infringing the Estate's Copyrights in violation of the Copyright Act by creating and distributing replicas and derivative works of the Copyrights—the 2020 and 2021 Cards.  Defendant filed a motion for summary judgment on various issues related to the Trustee's copyright infringement causes of action, namely, (1) whether the summary judgment evidence proves or disproves copyright infringement, and (2) if proven, whether the Estate could recover any damages under the Copyright Act.  The Court will first determine whether summary judgment as to copyright infringement is proper.  The Court will then turn to whether the Estate may recover any actual or statutory damages under the Copyright Act.

### A.  Copyright Infringement

A prima facie case of copyright infringement requires a copyright owner to prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Alcatel USA, Inc. v. DGI Tech's, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999).  The second prong requires two showings: the copyright owner must first demonstrate factual copying, and second, the copyright

owner must demonstrate that the allegedly infringing work is substantially similar to protectable elements of the infringed work. *S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 784 (5th Cir. 2020) ("A defendant unlawfully copies if it uses protected elements of a work and there is a substantial similarity between the protected work and the allegedly infringing work."); *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141–42 (5th Cir. 2004) (per curiam). Thus, the Fifth Circuit now views copyright infringement as requiring a plaintiff to prove three elements. "To prove copyright infringement, a plaintiff must establish (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Digit. Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 373 (5th Cir. 2020) (internal citations omitted).

### 1.  Whether the Estate is the Owner of Valid Copyrights

Copyright ownership is the first element of a copyright infringement claim. A plaintiff establishes copyright ownership by presenting "proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citing *Plains Cotton Coop. Ass'n v. Goodpasture Comput. Serv., Inc.*, 807 F.2d 1256, 1260 (5th Cir. 1987)). Here, all three requirements are met. Before beginning its analysis of the first element of copyright infringement, however, the Court must discuss the work for hire doctrine and the Estate's ownership of the Copyrights authored by AAA Sports.

### i.  The Work-For-Hire Doctrine & The Estate

As discussed in the Court's originality analysis, the evidence presented by the Trustee establishes that AAA Sports' employees created the Copyrights as part of their employment with AAA Sports. As the Court already discussed, under the work-for-hire doctrine, if an employee

prepares a copyrightable work for his or her employer, the employer is the author of the work, not the employee. 17 U.S.C. § 201(b). Thus, the evidence shows that AAA Sports was the owner of the Copyrights in the 1990s because AAA Sports' employees created the Copyrights for AAA Sports. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) ("If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." (citing 17 U.S.C. § 201(b)).

In addition, because AAA Sports was the owner of the Copyrights in the 1990s—including at the time it filed for bankruptcy—the Court concluded that the Copyrights became the property of the Estate once AAA Sports filed for bankruptcy. 11 U.S.C. § 541(a)(1). Now, the Estate is the owner of the Copyrights. The Court's analysis of the first element is couched in terms of whether AAA Sports, as the author, owned original and copyrightable works. Given that the Estate now owns the Copyrights, however, any conclusion as to whether AAA Sports was the owner of valid copyrights in the 1990s is also necessarily a conclusion as to whether the Estate is the owner of valid copyrights now.

In sum, AAA Sports' employees created the Copyrights. Therefore, under the work-for-hire doctrine, AAA Sports is the author (and was the owner) of the Copyrights. Once AAA Sports filed for bankruptcy, the Copyrights became the property of the Estate, and AAA Sports' ownership in the Copyrights transferred to the Estate as a matter of law. Now, the Estate is the owner and enjoys the exclusive rights in the Copyrights under the Copyright Act. With these matters clarified the Court may now address the elements of the Estate's copyright infringement claim.

## ii.    Whether the Statutory Formalities Are Satisfied

Beginning with the statutory formalities, a plaintiff may not prove copyright ownership without first establishing that he or she met the requisite statutory formalities.  A creator of a copyright "gains 'exclusive rights' in her work immediately upon the work's creation, including rights of reproduction, distribution, and display."  *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019) (internal citations omitted).  Under § 102 of the Copyright Act, copyright protection attaches to "original works of authorship fixed in any tangible medium of expression."  *Id.* (quoting 17 U.S.C. § 102(a)).  "The Copyright Act entitles a copyright owner to institute a civil action for infringement of those exclusive rights."  *Id.* (citing 17 U.S.C. § 501(b)).  A plaintiff cannot pursue a copyright infringement claim, however, until he or she complies with § 411(a)'s statutory requirement that 'registration of the copyright claim has been made.'"  *Id.* (quoting 17 U.S.C. § 411(a)).  So, while a copyright "owner's rights exist apart from registration, registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights."  *Id.*  Under § 411(a), a plaintiff fulfills her or her obligation as to the statutory formalities by submitting a complete application for registration, fee, and deposit to the Copyright Office.  17 U.S.C. § 411(a).  However, the statutory formalities are not met until "registration . . . has been made" pursuant to § 411(a).  *Wall-Street.com, LLC*, 139 S. Ct. at 892.  In other words, a copyright owner cannot initiate a copyright infringement suit until the Copyright Office actually registers the copyright; applying for a certificate of registration on its own is insufficient.  *Id.*

Here, the statutory formalities were met.  AAA Sports submitted copyright registration applications on behalf of the Copyrights, which it owned in the 1990s, in January of 2022.[7]  *See*

---

[7] Again, neither party takes issue with AAA Sports filing the applications.  Additionally, "[t]he 'copyright claimant' entitled . . . to register a copyright . . . may be either the author of the work or his assignee and any registration is of

(Dkt. #117, Exhibits 8–14).  The Copyright Office approved the applications on February 1, 2022,

and the Copyrights were considered effective as of January 13, 2022 (Dkt. #117, Exhibits 8–14).

Thus, the statutory formality element is satisfied.

### iii.    Whether the Copyrights Are Copyrightable and Original

Next, the Trustee must provide proof that the Estate is the owner of valid copyrights.  Stated

differently, the Trustee must provide proof that the Copyrights are original and copyrightable.  In

some cases, registration of the copyright, standing alone, may be sufficient to prove ownership in

a valid copyright.  *See Lee*, 379 F.3d at 141.  "A certificate of registration, if timely obtained, is

prima facie evidence both that a copyright is valid and that the registrant owns the copyright."  *Id.*

Under § 410, "[t]he certificate of a registration made before or within five years after first

publication of the work" is considered timely obtained.  17 U.S.C. § 410(c).  If a copyright owner

timely obtains a certificate of registration and is given the benefit of the presumption, then the

burden shifts to the defendant to prove invalidity.  *Norma Ribbon & Trimming, Inc. v. Little*, 51

F.3d 45, 47 (5th Cir. 1995).  To rebut this presumption, a defendant may offer evidence to dispute

the plaintiff's prima facie case of infringement.  *Id.*

Defendant argues that the Trustee is not afforded the benefit of the presumption in this

case.  According to Defendant, the Copyrights' registrations were not timely obtained.  Thus, the

Trustee cannot use registration as prima facie evidence that the Copyrights are valid or that AAA

Sports originally owned the Copyrights before they became part of the Estate.  The Court agrees.

Here, the Copyrights were first published in either 1992 or 1993 (Dkt. #117, Exhibits 8–14).

However, the Copyrights were not registered until 2022, which is well beyond the five-year time

---

the work *per se* and redounds to the benefit of the . . . assignee."  *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d
189, 194–95 (2d Cir. 1985).  As the author, AAA Sports was entitled to register the Copyrights.  Regardless, where
an error is done unknowingly and would not cause the application to be rejected, the error does not require dismissal
of infringement claims.  *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.*, 690 F. Supp. 298, 302 (S.D.N.Y. 1988).

limit (Dkt. #117, Exhibits 8–14).  Thus, the Trustee is deprived of the benefit of the rebuttable presumption of prima facie validity under 17 U.S.C. § 410(c).  *See Lee*, 379 F.3d at 141.  Because the Trustee is not entitled to the benefit of the rebuttable presumption, he bears the burden of establishing that AAA Sports was the original owner of the Copyrights.  *Norma Ribbon & Trimming, Inc.*, 51 F.3d at 47; *Eng'g Dynamics, Inc.*, 26 F.3d at 1340.

Defendant argues that the Art and Text Copyrights are not copyrightable because some of the elements are not protectable; for example, the specific layout of the elements and the parallel lines with trailing zigzags.  Defendant further argues, along the same line, that the Art and Text Copyrights are not original to AAA Sports because many of the features are common designs in sports trading cards.  Likewise, as to the Stat Smashers Copyright, Defendant argues "that a two-word phrase, consisting of a straight lettered word juxtaposed with a crooked lettered word, within a jagged lined box was not original to AAA Sports" (Dkt. #111, at p. 24).  Thus, "a jagged line that abuts a rectangle which is a mere variation on the familiar geometric shapes" is not copyrightable (Dkt. #111, at p. 24).  Based on these arguments, Defendant contends the features on which the Copyrights are based are neither copyrightable nor original.  The Trustee counterargues that the Copyrights are original and copyrightable because "at a minimum the selection and arrangement of the combined design elements of the Stat Smashers trading card easily meets the low threshold of originality" (Dkt. #128 at p. 14).  And the Art and Text Copyrights reflect a unique set of sports trading cards that were the first of their kind and, since their release, have gained great notoriety (Dkt. #128 at pp. 15–16).

As an initial matter, Defendant's argument seems to conflate originality and copyrightability with protectability.  At bottom, Defendant argues that the works are not original or capable of copyright because some of the elements of the Copyrights "are familiar symbols,

30

formats, and layouts" which are common and independently incapable of copyright protection (Dkt. #111 at p. 18). "While it is common to separate unprotectible from protectible elements in a work at the infringement stage, such dissection is inappropriate at the originality stage." 2 William F. Patry, *Patry on Copyright* § 3:35 (last updated March 2023) (citing *Fischer v. Forrest*, No. 14-CV-1304, 2017 WL 2992663, at \*10 (S.D.N.Y. July 14, 2017), *R&R adopted*, 286 F. Supp. 3d 590 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020)). A work can contain uncopyrightable elements yet still be original and copyrightable as a whole. *See Batiste v. Najm*, 28 F. Supp. 3d 595, 600 (E.D. La. 2014). Indeed, in determining ownership of a valid copyright, the key is that the Court must look at "originality and copyrightability in the work *as a whole*" and not just individual elements of the work. *See Eng'g Dynamics, Inc.*, 26 F.3d at 1340 (emphasis added); *see also* 2 *Patry on Copyright* § 3:35. Thus, Defendant's argument regarding the specific elements of the Copyrights, although relevant to the question of actual infringement, is not relevant to whether the Trustee has proven ownership in a valid copyright.

Now that the Court has clarified the differences between the protectability of individual elements and copyrightability and originality in the copyrighted work as a whole, the Court will determine whether the Copyrights are copyrightable. A work is "copyrightable," or capable of receiving copyright protection, if it is an "original work[] of authorship fixed in any tangible medium of expression, now known or later developed, from which [it] can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(b). Conversely, by the plain terms of the statute, "[i]n no case" does copyright protection extend to any "idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied . . . ." *Id.* § 102(b). Relevant here, "[w]orks of authorship include . . . pictorial, graphic,

31

and sculptural works."  *Id.* § 102(a)(5).  According to § 101 of the Copyright Act, pictorial or graphic works are "two-dimensional . . . works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans."  *Id.* § 101.  In this case, the Copyrights, as a whole, are capable of receiving copyright protection because they are tangible works that are pictorial or graphic in nature.  Therefore, if the works, as a whole, are also original, then the first prong—ownership of a valid copyright—is met.

"The *sine qua non* of copyright is originality."  *Feist*, 499 U.S. at 345.  Indeed, at a base level, "[t]o qualify for copyright protection, a work must be original to the author."  *Id.* (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985)).  "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  *Id.* (quoting 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.01(A)–(B) (Matthew Bender, ed., rev. ed. 2022)).  To that end, a work does not need to be novel to be original.  *Feist*, 499 U.S. at 345–46.  On the contrary, a work may be "crude, humble, or obvious" and still be considered original.  *Id*.  To be sure, "the requisite level of creativity is extremely low; even a slight amount will suffice."  *Id.* at 346.  In fact, "[t]he vast majority of works make the grade quite easily, as they possess some creative spark . . . ."  *Id.*

The question of a work's originality is generally a question of fact for the jury.  2 *Patry on Copyright* § 3:39 ("[O]riginality is a question of fact.").  Because originality is generally a fact question for the jury, it is determined as a matter of law only if the evidence is so overwhelmingly in favor of the movant that no reasonable jury could find a contrary result."  *Sortiumusa LLC v. Hunger*, No. 3:11-CV-1656, 2013 WL 11730655, at *16 (N.D. Tex. Mar. 31, 2013); s*ee also Home*

*Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1409 (11th Cir. 2015) (originality is a question of fact); *N. Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1034–35 (9th Cir. 1992) (explaining that originality is a question of fact for a jury). That is not the case here. The evidence is not so overwhelmingly in favor of Defendant such that no reasonable jury could find that the Copyrights are original. On the contrary, the summary judgment record indicates that there is evidence to support the Trustee's contention that AAA Sports independently created the Copyrights and that some degree of creativity was required in creating the Copyrights.

There is evidence in the record that the Copyrights were designed by AAA Sports' product development team. To start, the corporate representative for AAA Sports testified that "the employees of AAA Sports designed the Stat Smasher card" (Dkt. #117, Exhibit 1 at pp. 23–24). More specifically, the record reflects that the Stat Smashers Logo and the Wild Card Stat Smashers card series were designed by Cartheuser, along with the AAA Sports creative team, as part of her job as the Director of Creative Services at AAA Sports (Dkt. #113, Exhibit 40 at pp. 12–13; Dkt. #117, Exhibit 1 at p. 23; Dkt. #117, Exhibit 4 at pp. 6–7; Dkt. #130, Exhibit 28 at pp. 2–3). Cartheuser testified that AAA Sports' employees would collaborate on ideas (including the graphics, photos, and text for the cards) and provide her with inspiration (Dkt. #130, Exhibit 28 at pp. 4–5). Cartheuser would then create sketches, both hand drawn and digital, of potential trading card designs (Dkt. #113, Exhibit 40 at p. 15; Dkt. #130, Exhibit 28 at p. 4). The product development team would then further collaborate and decide which design elements to implement (Dkt. #130, Exhibit 28 at p. 5). According to Cartheuser, she created the card designs herself without using Clip Art (Dkt. #130, Exhibit 28 at p. 7). Additionally, Cartheuser testified that, while she did review other sports trading cards, it was minimal and just so she had a general idea

of what was going on in the industry (Dkt. #113, Exhibit 40 at pp. 8–9).  Cartheuser further testified that she specifically designed the Stat Smashers Logo (Dkt. #113, Exhibit 40 at pp. 8–9).

Further, John Stanko ("Stanko")—Defendant's own expert witness—stated in his deposition that there is some level of creativity in how a card designer presents a player's photograph, name, position, and team information (Dkt. #130, Exhibit 27 at p. 7).  Stanko stated that he observed creative differences, at least to some degree, in all of the visual presentations of the thousands of cards he reviewed (Dkt. #130, Exhibit 27 at p. 7).  According to Stanko, creativity may exist even for cards that conform to a standard template (Dkt. #130, Exhibit 27 at p. 8). Creativity may be found in the color selection, the presentation of the photos, the tone or saturation used on the images, the font, or even the choice of a border on the card (Dkt. #130, Exhibit 27 at p. 10).  Stanko further testified that, although the Copyrights conform to a basic visual pattern, there are design differences from card to card that make them unique and that there was some creativity employed by the people who designed the Copyrights (Dkt. #130, Exhibit 27 at p. 13). In addition, Stanko testified that a creator's choice to use zigzags is part of his or her creative process (Dkt. #130, Exhibit 27 at p. 13).  And, according to Stanko's report, "patterns overlaying the photograph in Appendix A are primarily what makes the [Art and Text Copyrights] visual design unique from other trading cards on the market in 1992-93" (Dkt. #113, Exhibit 75 at pp. 6, 10).

Cartheuser and Stanko's testimony indicates that there is evidence to support that the Copyrights were independently created by AAA Sports in the 1990s (as opposed to copied from other works) and that the Copyrights possess at least some minimal degree of creativity.  Therefore, there is evidence that the Copyrights are original.  Defendant did not present evidence that is so overwhelmingly in favor of a finding that the Copyrights are unoriginal such that no reasonable

jury could find otherwise.  Thus, there is a genuine issue of material fact and summary judgment in favor of Defendant on this element is not warranted.

### 2.   Whether There Was Factual Copying of the Copyrights

As to the second element of copyright infringement, a "plaintiff must, as a factual matter, prove that the defendant "'actually used the copyrighted material to create his own work.'"  *Lee*, 379 F.3d at 141 (quoting *Eng'g Dynamics*, 26 F.3d at 1340).  However, Defendant does not address this element in its motion for summary judgment.  Therefore, Defendant waived any argument that there is an absence of evidence to support this element.  Summary judgment is not warranted.

### 3.   Whether There Is Evidence of Substantial Similarity

Because Defendant did not address factual copying, the Court moves on to Defendant's argument that there is an absence of evidence to support substantial similarity.  Under the substantial similarity prong, the plaintiff must demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar to protectable elements of the infringed work.  The substantial similarity prong determines the actionability of any copying. *Batiste*, 28 F. Supp. 3d at 602.  The inquiry is "whether factual copying is 'quantitatively and qualitatively sufficient' to support liability."  *Id.*  In other words, the Court must determine "whether the allegedly infringing work bears a substantial similarity to the protectable aspects of the original work."  *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (citing *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 398 (5th Cir. 2001) ("To support a claim of copyright infringement, the copy must bear a substantial similarity to the protected aspects of the original.")).  The Court cannot, however, compare the Infringing Works to the Copyrights until it determines the scope of the copyright protection.

###### i.    Which Elements of the Copyrights Are Protectable

"[W]here the copyrighted work contains unprotectable elements, the first step [at the substantial similarity stage] is to distinguish between protectable and unprotectable elements of the copyrighted work." *Id.* (citing *Peel & Co.*, 238 F.3d at 398 (holding that the district court erred in failing to identify the original constituent elements of the copyrighted design before comparing the two works); *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533–34 (5th Cir. 1994) ("To determine the scope of copyright protection in a close case, a court may have to filter out . . . unprotectable elements of plaintiff's copyrighted materials to ascertain whether the defendant infringed protectable elements of those materials."); *Feist*, 499 U.S. at 361 (describing an element of infringement as the "copying of constituent elements of the work that are original")). A "copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Kepner–Tregoe, Inc.*, 12 F.3d at 533.  "To determine the scope of copyright protection in a close case, a court may have to filter out ideas, processes, facts, idea/expression mergers, and other unprotectable elements of plaintiff's copyrighted materials to ascertain whether the defendant infringed protectable elements of those materials." *Id.* at 533–34 (internal citations omitted).  Non-protectable elements of a copyrighted work include "[w]ords and short phrases such as names, titles, and slogans; familiar symbols and designs; . . . [and] lettering or coloring." 37 C.F.R. § 202.1; *see also Jane Envy, LLC v. Infinite Classic Inc.*, No. 14-CV-065, 2016 WL 797612, at *6 (W.D. Tex. Feb. 26, 2016), *aff'd*, No. 14-CV-065, 2016 WL 5373035 (W.D. Tex. Sept. 26, 2016).

On their own, words, names, titles, slogans, and familiar symbols and designs are not capable of copyright protection. *Id.*  However, "a work comprising uncopyrightable elements may, through original organization and presentation, be protected by copyright law." *Glasscraft Door*

36

*I, L.P. v. Seybro Door & Weathership Co.*, No. 08-CV-2667, 2009 WL 3460372, at *3 (S.D. Tex. Oct. 22, 2009). Put another way, "a work that is entirely a collection of unoriginal material nevertheless may be copyrighted if the material is selected, coordinated or arranged in an original fashion." *Diamond Direct, LLC v. Star Diamond Grp., Inc.*, 116 F. Supp. 2d 525, 528 (S.D.N.Y. 2000) (citing *Feist*, 449 U.S. at 358). The copyright, and copyright protection, are in the "particular way in which the underlying unprotected elements are combined . . . ." *Jane Envy*, 2016 WL 797612, at *6 (cleaned up) (quoting *Diamond Direct*, 116 F. Supp. at 528).

Beginning with the protectable elements of the Stat Smashers Copyright, Defendant argues that the Stat Smashers Copyright is limited in scope. Specifically, Defendant argues that the copyright only protects the Stat Smashers Logo and nothing more. According to Defendant, this means that the actual words "Stat Smashers" are not protectable, only the artwork related to the logo. Defendant further argues that the 2-D artwork and the text on the back of the Copyrights are not protectable. The Trustee counterargues that the Stat Smashers Logo includes the words. In addition, the Trustee argues that the text and 2-D art should also be included as part of the Stat Smashers Copyright because the registration does not indicate that the text or 2-D art was excluded. Based on the certificate of registration for Registration '020, the Court agrees with Defendant in part and the Trustee in part.

The certificate of registration for the Stat Smashers Copyright indicates that the author-created material in the Stat Smashers Copyright is the Stat Smashers Logo (Dkt. #117, Exhibit 14 at p. 3). Under the corresponding section of the registration labeled "[l]imitation of copyright claim," the "new material included in claim" subsection again indicates that the Stat Smashers Copyright only covers the Stat Smashers Logo (Dkt. #117, Exhibit 14 at p. 3). The text and the 2-D art are not included in that subsection. *See* (Dkt. #117, Exhibit 14 at p. 3). Although the Trustee

37

is correct that the "material excluded from this claim" does not indicate that the 2-D art or the text were excluded, that does not necessarily mean they are included.  Indeed, to argue that an element is included in the Stat Smashers Copyright simply because it was not specifically excluded would lead to any number of non-protectable elements suddenly being deemed protectable as part of the Stat Smashers Copyright.  Moreover, the juxtaposition of the certificate of registration for the Stat Smashers Copyright with the certificates of registration for the Art and Text Copyrights is telling. In each of the Art and Text Copyrights, the certificate of registration specifically indicates that the copyrighted material includes the text and the 2-D art (Dkt. #117, Exhibits 8–13).  With these differences in mind, the certificate of registration for the Stat Smashers Copyright does not include the text or 2-D artwork on the card.  That is, the only protected element of the Stat Smashers Copyright is the Stat Smashers Logo itself.

Defendant also argues that the words in the Stat Smashers Logo are not protected.  The Court disagrees to an extent.  Generally, "[w]ords and short phrases such as names, titles, and slogans" are not afforded the benefit of copyright protection.  37 C.F.R. § 202.1.  However, as discussed, even if individual elements are not themselves protectable, the "particular way in which the underlying unprotected elements are combined" may warrant copyright protection.  *Jane Envy*, 2016 WL 797612, at *6 (cleaned up) (quoting *Diamond Direct*, 116 F. Supp. at 528); *see also Feist*, 499 U.S. at 348–49.  Here, the words "Stat Smashers" are arranged in a particular way that is unique and original.  *Feist*, 499 U.S. at 349 ("[I]f the selection and arrangement are original, these elements of the work are eligible for copyright protection.").  Therefore, the protection afforded the Stat Smashers Copyright includes the selection and arrangement of the words "Stat Smasher."  Importantly, though, this does not mean that the phrase "Stat Smashers" is protected. Rather, the phrase, as displayed in the Stat Smashers Copyright, is protected.

Next, the Court turns to the protectable elements of the Art and Text Copyrights.  The parties dispute whether copyright protection extends to the arrangement and selection of the logos, colors, and shading of the cards as a whole, the parallel lines that end in a zigzag on the front of the cards, and the arrangement of the boxes and information on the back of the card.  Defendant argues that these elements are nothing more than familiar symbols, designs, and colors that are incapable of copyright protection.  The Trustee argues, on the other hand, that the selection and arrangement of the logos, parallel lines, zigzags, colors, shading, information, and boxes are protectable as a whole under the umbrella of the 2-D artwork.

The Court concludes that the scope of the 2-D artwork is a question of fact for the jury, except as to the logos.  The logos are not part of the 2-D artwork as they are specifically excluded. The rest of the elements, however, may be part of the 2-D artwork.  Defendant is correct that the parallel lines, zigzags, and boxes are common geometric shapes.  Therefore, these elements of the Art and Text Copyrights are incapable of copyright protection on their own.  *See* 37 C.F.R. § 202.1. Likewise, the colors and shading elements are also unprotectable on their own.  *See id.*  However, it is possible that the scope of the 2-D artwork was meant to protect the arrangement and selection of these design elements.  To that end, there is a fact issue precluding the Court from granting summary judgment on the issue.

Undoubtedly, the parallel lines ending in a zigzag and the selection and arrangement of the boxes and information are unique and original to the trading cards that AAA Sports created in the 1990s.  However, when registering the Copyrights, it is not clear that AAA Sports actually received protection over these elements.  *See* (Dkt. #117, Exhibits 8–14; Dkt. #113, Exhibit 66).  That is, the language used in the applications, compared to the language used in the certificates of registration, differs such that it is not readily apparent which aspects of the application are now

39

included in the certificates of registration.  *Compare* (Dkt. #117, Exhibits 8–14), *with* (Dkt. #113, Exhibit 66).  In an email correspondence, the Copyright Office noted that the application "asserted a claim in 'text, logos, designs, color schemes, and the selection and arrangement of material on cards'" but that "[s]ome of these terms do not describe the copyrightable authorship we see in this work."  *E.g.,* (Dkt. #113, Exhibit 66 at p. 16).  The Copyright Office then went on to note that it does "see 2-D artwork and text that [it] may register" (Dkt. #113, Exhibit 66 at p. 16).  However, the Copyright Office never clarified which parts were unprotectable and which parts were included in the 2-D artwork.  Rather, the Copyright Office noted "that Copyright does not protect familiar symbols or designs, mere changes or variations of color, or formats and layouts"  (Dkt. #113, Exhibit 66 at p. 16).  In making this point, the Copyright Office did not comment on the selection and arrangement of these elements.  *See* (Dkt. #113, Exhibit 66 at p. 16).  Considering the Copyright Office's change in descriptive language and silence regarding the selection and arrangement, it is possible that the selection and arrangement of these individually unprotected elements are protected as a whole in the 2-D artwork.  Accordingly, whether the particular way that the parallel lines ending in a zigzag, the colors, shading, text, and box elements are combined is unique or original such that each element is part of the 2-D artwork and protected is a question of fact for the jury.  *See Jane Envy*, 2016 WL 797612, at *6.  If the jury finds that the selection and arrangement of these elements is included as part of the 2-D artwork, which is specifically enumerated as a protected element on the Art and Text Copyrights, then they are protected.  If, on the other hand, the jury determines that the selection and arrangement of these elements were not included as part of the 2-D artwork, then they are not protected.

Thus, the Stat Smashers Logo, including the selection and arrangement of the letters in the Stat Smashers Logo, is protected as a matter of law.  In addition, the text and the 2-D artwork on

the Art and Text Copyrights are protected elements of the Art and Text Copyrights.  However, whether the selection and arrangement of the parallel lines, zigzags, colors, shading, and boxes are protectable elements of the 2-D art on the Art and Text Copyrights is a factual dispute that must be determined by the jury.

<div align="center">

ii.      **Whether the Copyrights and Infringing Works are Substantially Similar**

</div>

The test used in the Fifth Circuit to determine substantial similarity requires the Court conduct "a side-by-side comparison . . . between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  *Nola Spice Designs*, 783 F.3d at 550.  The Court makes this inquiry after distinguishing between the protectable and unprotectable elements of the copyrighted work.  *Id.* (citing *Peel & Co.*, 238 F.3d at 398).   The determination should be based on the perspective of a layman or ordinary observer.  *Id.*  (citing *Peel & Co.*, 238 F.3d at 398).   Additionally, the Court should consider the importance of the copied protectable elements to the copyrighted work as a whole.  *Id.* (citing *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 373 n.12 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Eng'g Dynamics, Inc.*, 26 F.3d at 1343). Typically, the question of whether two works are substantially similar should be left to the ultimate factfinder, but "summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression."  *Lee*, 379 F.3d at 142.

As to the Stat Smashers Copyright, after conducting a side-by-side comparison—and viewing the evidence and drawing inferences in a manner most favorable to the Estate—the Court concludes that a reasonable jury could find substantial similarity between the protectable elements

<div align="center">

41

</div>

of the Stat Smashers Copyright and the Infringing Works.  Thus, summary judgment in favor of Defendant on this issue is not warranted.

Regarding the Art and Text Copyrights, however, the Court concluded that whether some of the elements are part of the protected 2-D artwork is a question of fact for the jury.  Thus, the Court is unable to conduct a side-by-side comparison of the Art and Text Copyrights and the Infringing Works.  Regardless, whether the Art and Text Copyrights and the Infringing Works are substantially similar is best left to the jury.  Summary judgment in favor of Defendant on this issue is not warranted.

### 4.  Whether the Infringing Works are Derivative Works

Section 106 of the Copyright Act provides the copyright owner exclusive rights "to prepare derivative works based on the copyrighted work."  17 U.S.C. § 106(2).  Thus, an individual who infringes on a copyright owner's exclusive rights by creating a derivative work violates the Copyright Act.  17 U.S.C. § 106(2).  Section 101 defines a derivative work as:

> a work based on one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations or other modifications which, as a whole, represent an original work of authorship is a "derivative work."

17 U.S.C. § 101.  "To constitute a derivative work, 'the infringing work must incorporate in some form a portion of the copyrighted work'" and it "must be substantially similar to the copyrighted work."  *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984), *cert. denied*, 470 U.S. 1052 (1985)).  Thus, "[a] 'derivative work' that is substantially similar to the original work upon which it is based is an infringement.  *CBS Operations Inc. v. Reel Funds Int'l, Inc.*, No. 3-06-CV-0588, 2007 WL 2325218, at *5 (N.D. Tex. Aug. 13, 2007) (citing *Atkins v. Fischer*, 331 F.3d 998, 993 (D.C. Cir.

2003) (and cases cited therein); *TMTV, Corp. v. Mass Prods., Inc.*, 345 F. Supp. 2d 196, 208 (D. Puerto Rico 2004) (same).

The Court already determined that whether the Infringing Works are substantially similar to the Copyrights is a question best left to the jury.  Thus, the Court again holds that a reasonable jury could find substantial similarity between the Copyrights and the Infringing Works.  Thus, summary judgment in favor of Defendant on this issue is not warranted.

### B.  Whether There is Evidence of Damages Under the Copyright Act

The Copyright Act allows a copyright owner to recover either "actual damages and any additional profits of the infringer," or "statutory damages," but not both.  17 U.S.C. § 504(a).  A copyright owner may choose statutory damages "regardless of the adequacy of the evidence offered as to his actual damages and the amount of defendant's profits, and even if he has intentionally declined to offer this evidence, although it was available."  4 Nimmer, § 14.04[A]; *see, e.g., Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 507 (1st Cir. 2011) ("[T]he availability of statutory damages is not contingent on the demonstration of actual damages."); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496–97 (4th Cir. 1996) (upholding maximal statutory copyright damages award of $400,000 where gross revenue from infringement was $10,200).

Defendant argues that the Estate is not entitled to actual or statutory damages or attorneys' fees for copyright infringement.  According to Defendant, the Court should grant summary judgment in its favor on the Trustee's copyright infringement cause of action because, even if the Trustee proves infringement, the Trustee could not possibly recover damages on behalf of the Estate.  The Court will first address the issue of statutory damages and attorneys' fees.  Then, the Court will turn to the issue of actual damages.

### 1.    Whether The Estate is Entitled to Statutory Damages and Attorneys' Fees

The Trustee agrees with Defendant that the Estate cannot recover statutory damages or attorneys' fees because the Copyrights were untimely registered (Dkt. #143 at p. 8).  Accordingly, the Trustee withdraws any claim to attorneys' fees or statutory damages for copyright infringement by Defendant (Dkt. #143 at p. 8).  Given the Trustee's withdrawal of any claim for statutory damages or attorneys' fees, this issue is now moot.  Next, the Court turns to the issue of actual damages under the Copyright Act.

### 2.    Whether The Estate is Entitled to Actual Damages

Section 504(a)(1) of the Copyright Act provides that an infringer is liable for "actual damages and any additional profits."  17 U.S.C. § 504(a).  Section 504(b) provides:

> The copyright owner is *entitled to recover the actual damages* suffered by him or her as a result of the infringement, *and any profits* of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

*Id.* § 504(b).

Defendant argues that the Trustee cannot prove actual damages because there is no evidence of actual damages, and the Trustee cannot establish a causal link between Defendant's alleged infringement and revenue generated by the allegedly infringing products.  According to Defendant, there is no evidence of actual damages because (1) the Trustee did not retain an expert witness to testify as to actual damages, (2) there is no evidence that a market exists for the alleged copyrights, and (3) the Trustee never tried to monetize the alleged copyrights.  Each argument is dead on arrival.

Defendant's argument as to why the Trustee cannot recover damages amounts to no argument.  The sum of Defendant's argument is eight conclusory sentences spread throughout

multiple sections of its twenty-eight-page motion (Dkt. #110 at pp. 13–14, 18–19).  In these eight sentences, Defendant cites a single non-binding case, which could only plausibly support one of Defendant's multiple arguments.  Thus, Defendant essentially "provides no argument to support its claim and 'it is not the Court's duty to make the parties' arguments for them.'" *TXI Operations, LP v. City of McKinney, Tex.*, No. 4:20-CV-353, 2023 WL 161942, at *9 n.4 (E.D. Tex. Jan. 11, 2023) (quoting *Meier v. UHS of Del, Inc.*, No. 4:18-CV-00615, 2019 WL 6465314, at *8 (E.D. Tex. Dec. 2, 2019); *Mendoza v. A&A Landscape & Irrigation*, LP, No. 4:12-CV-562, 2013 WL 12403556, at *2 (E.D. Tex. Nov. 26, 2013) ("It is not the obligation of the Court to make arguments on [the parties'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court.")).  Accordingly, summary judgment in favor of Defendant on this issue is not warranted.

## IV.  Violations of the DMCA

According to § 1202(a)(1) and (2) of the DMCA, "no person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—(1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false."  17 U.S.C. § 1202(a).  Accordingly, to prove a violation of § 1202(a), the Trustee must prove that Defendant (1) knew CMI was false, (2) provided, distributed, or imported to distribute the false CMI, (3) with the intent to induce, enable, facilitate, or conceal an infringement.  *RAZ Imports, Inc. v. Regency Int'l Bus. Corp.*, No. 3:19-CV-01855, 2020 WL 4500627, at *3 (N.D. Tex. Aug. 5, 2020) (citing *Aaberg v. Francesca's Collections, Inc.*, No. 17-CV-115, 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018)).

Further, under § 1202(b)(1), (2), and (3), a plaintiff must prove that the defendant (1) intentionally removed or altered CMI without the authority of the copyright owner or the law,

or (2) distributed or imported for distribution CMI knowing that the CMI had been removed or altered without the authority of the copyright owner of the law, or (3) distributed or imported for distribution copies of works knowing that CMI had been removed or altered without the authority of the copyright owner of the law.  17 U.S.C. § 1202(b).  Under § 1202(b), a plaintiff must also prove that a defendant knew or had reasonable grounds to know that it would induce, enable, facilitate, or conceal an infringement of any right under Title 17 when it violated § 1202(b).  17 U.S.C. § 1202(b).  Thus, to state a claim under § 1202(b)(1), the Trustee must allege (1) the existence of CMI in connection with a copyrighted work; (2) removal and/or alteration of that CMI; (3) that the removal and/or alteration was done intentionally; and (4) while knowing, or having reasonable grounds to know, that such removal will induce, enable, facilitate, or conceal an infringement.  17 U.S.C. § 1202(b)(1).  And, to state a claim under § 1202(b)(2) and (3), the Trustee must allege (1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant distributed works or copies of works; (3) while knowing that CMI has been removed or altered without authority of the copyright owner or the law; and (4) while knowing, or having reasonable grounds to know, that such distribution will induce, enable, facilitate, or conceal an infringement.  17 U.S.C. § 1202(b)(2), (3).

The Trustee accuses Defendant of violating § 1202(a) and (b) of the DMCA.  Defendant filed a motion for summary judgment on various issues related to the DMCA causes of action, namely, (1) whether the alleged CMI qualifies as CMI; (2) whether there is a genuine issue of material fact regarding the element of intent; and (3) whether Defendant can put CMI on its own works that are distinct from the Copyrights.  The Court will address each issue in turn, beginning with whether there was any CMI as defined by the DMCA.

## A.  Whether the Information Identified by the Trustee is CMI Under the DMCA

The parties dispute which features of the Copyrights constitute CMI.  The DMCA defines CMI as information conveyed in connection with copies of a work, including in digital form.  17 U.S.C. § 1202(c).  Specifically, § 1202(c) limits CMI to eight categories of information, including the title of a work, the author of a work, the copyright owner of a work, the terms and conditions for using a work, and identifying numbers or symbols referring to such information, among others. *Id.*

Defendant argues that "[o]ther than the generic copyright notice, the purported Alleged CMI fails to inform the public that something other than the entire card itself was copyrighted" (Dkt. #112).  According to Defendant, this is true for three reasons.  First, some of the alleged CMI—the Wild Card logo—is a trademark that AAA Sports abandoned and does not indicate copyright ownership, authorship, or title.  Second, the copyright notice was not sufficiently close in proximity to all the copyrights to inform the public that something other than the entire card was copyrighted.  And third, neither the numbering system nor the parallel zigzag lines constitute identifying numbers or symbols.  Thus, Defendant argues that the DMCA claims fail as a matter of law.  All three of Defendant's arguments miss the mark.  The Court will address each in turn.

### 1.  Whether the Wild Card and Stat Smashers Logos Are CMI

To start, Defendant cites no caselaw, and the Court can find none, to support its proposition that abandoning a trademark means that a copyrighted work's title or an author's name can no longer serve as CMI.  The Court fails to see how the AAA Sports Trademarks are relevant to the question of whether the Wild Card logo constitutes CMI.  Regardless, as discussed below, the Trustee has presented evidence demonstrating that there is a factual dispute with respect to whether the Wild Card is CMI.

47

Section 1202(c) unambiguously defines CMI as "[t]he title and other information identifying the work" and "[t]he name of, and other identifying information about, the author of a work . . . ." 17 U.S.C. § 1202(c)(1), (2).  In this case, the Trustee presented evidence that the registered title of the Copyrights all included "Wild Card" and "Stat Smashers."  In addition, in response to Defendant's interrogatories, the Trustee noted that the Copyrights were part of the Stat Smashers card insert series (Dkt. #130, Exhibit 1 at pp. 6, 11).  Further, Douglas Atkins, Jr. testified, as AAA Sports' corporate representative, that the Stat Smashers cards were part of a series of card inserts (Dkt. #130, Exhibit 3 at pp. 4–5).  Douglas Atkins, Jr. also testified that "Stat Smashers" was the title of the cards (Dkt. #130, Exhibit 2, at p. 23).  And, in the Excerpted 39th Edition of the Beckett Football Card Price Guide, the guide labels some of AAA Sports' 1992 and 1993 sports trading cards as "1992 Wild Card Stat Smashers" and "1993 Wild Card Stat Smashers" (Dkt. #130, Exhibit 36 at p. 8).  Thus, there is evidence to support that the Wild Card logo and the Stat Smashers Logo on the front of the Copyrights are CMI as defined by § 1202(c).

Further, as the Court already concluded in its analysis on copyright infringement, there is evidence that AAA Sports was the author of the Copyrights (Dkt. #117, Exhibit 1 at p. 23; Dkt. #117, Exhibit 4 at pp. 6–7; Dkt. #130, Exhibit 28 at pp. 2–3).  There is also evidence that AAA Sports publicly did business as "Wild Card," which means there is evidence that the name of the author of the work was Wild Card.  Douglas Atkins, Jr. testified that AAA Sports printed and sold cards in the name of AAA Sports while it was publicly doing business as Wild Card (Dkt. #117, Exhibit 2 at pp. 5, 7).  Douglas Atkins, Jr. further testified that AAA Sports is the author and Wild Card is the name that AAA Sports did business as (Dkt. #130, Exhibit 2 at p. 23).  Additionally, as the Court just discussed, the Excerpted 39th Edition of the Beckett Football Card Price Guide notes that the Copyrights were "1992 Wild Card Stat Smashers" and "1993 Wild Card Stat

Smashers" cards, which is further evidence in support of the Trustee's contention that Wild Card was colloquially known as the author of the cards (Dkt. #130, Exhibit 36 at p. 8).  Thus, there is evidence to support that the Wild Card logo denoted on the front of the Copyrights is CMI, as defined by § 1202(c), because AAA Sports, who publicly did business as Wild Card, was the author of the Copyrights.

### 2.  Whether the Copyright Notice is CMI

Next, Defendant argues that the copyright notice does not constitute CMI because "the generic AAA Sports copyright, was conveyed in connection with the entire layout of the cards and was not sufficiently close to a protectable copyrighted work" (Dkt. #112 at p. 21).  Essentially, Defendant argues that the generic copyright notice does not qualify as CMI because it was not "conveyed in connection with" the Copyrights as required by § 1202(c).  Defendant cites *Logan v. Meta Platforms, Inc.*, No. 22-CV-01847, 2022 WL 14813836 (N.D. Cal. Oct. 25, 2022) and *Drauglis v. Kappa Map Grp., LLC*, 128 F. Supp. 3d 46 (D.D.C. 2015) in support of its argument. The Trustee counterargues that the copyright notice is conveyed in connection with each of the Copyrights because it is on or near the Copyrights and provides the name of the author and other identifying information.  Further, the Trustee contends that there is a factual dispute as to whether the copyright notice is CMI.  The Court agrees with the Trustee.  There is evidence that there is a genuine issue of material fact regarding whether the copyright notice constitutes CMI.  To that point, *Meta Platforms* and *Drauglis* are not binding on this Court and are readily distinguishable.

In *Meta Platforms*, the plaintiff sued Meta Platforms, Inc. ("Meta"), the owner of Facebook, because he believed that Meta's copyright tag displayed at the bottom of each Facebook user's home page misidentified Meta as the "author" of his photos on his user homepage.  *Meta Platforms*, 2022 WL 14813836 at *7.  The district court held that the plaintiff failed to plead facts,

which, if taken as true, would demonstrate that Meta's CMI was not "conveyed in connection with copies" of the plaintiff's photos. *Id.* at *8. The district court reached this conclusion because the CMI was not located on or next to the plaintiff's photos. *Id.* Instead, the CMI was located at the bottom of the webpage in a shaded box, which was separated from the rest of the page's content. *Id.*

Similarly, in *Drauglis*, the plaintiff's copyright, a photograph, was on the front cover of the defendant Kappa Map Group, LLC's ("KMG") atlas. *Drauglis*, F. Supp. 3d at 59. KMG's atlas contained a copyright notice on the first page inside the atlas. *Id.* According to the plaintiff, this implied that KMG owned the plaintiff's photograph, which is a violation of § 1202(a). *Id.* The district court held that this did not constitute a violation of § 1202(a) because caselaw on this matter indicates that a "copyright notice on the first inside page of a street atlas was not 'conveyed in connection with' the cover photograph and that it therefore cannot form a valid basis for a section 1202(a) claim." *Id.* at 60. According to the district court, in that scenario, the CMI is not conveyed in connection with the cover photo because the CMI is not in the body of, or the area around, the photo. *Id.* Therefore, the CMI inside the first page of KMG's atlas is not actionable CMI as defined by § 1202(c). *Id.*

Here, this is not a situation where the CMI is located on a webpage in an area that is separate and distinct from the posts containing the copyright owner's photographs. *Meta Platforms*, 2022 WL 14813836 at *7. Nor is this a situation where the CMI is on a completely separate page inside a book rather than on the cover next to the copyrighted work. *Drauglis*, F. Supp. 3d at 59–60. In fact, this is not even a situation where the CMI is not located on the Copyrights. On the contrary, as the Trustee points out, the copyright notice was located directly on the cards. Moreover, whether the copyright notice is sufficiently near the Copyrights such that it constitutes CMI is a

question of fact for the jury.  *See Huffman v. Activision Publ'g, Inc.,* No. 2:19-CV-00050, 2020 WL 8678493, at *14 (E.D. Tex. Dec. 14, 2020), *R&R adopted*, No. 219-CV-00050, 2021 WL 2141352 (E.D. Tex. May 26, 2021) (determining that whether CMI is conveyed in connection with the copyrighted work is a factual dispute for the jury).  Thus, there is evidence that the copyright notice was conveyed in connection with the Copyrights and, therefore, is CMI as defined by § 1202(c).

### 3.   Whether the SS Numbering System is CMI

Defendant also argues that the "SS-##" numbering system used on the Copyrights is not CMI.  Defendant argues that the numbering system does not convey copyright ownership or authorship.  Defendant further argues that the numbering system on each card is not conveyed in connection with a copyright.  In support of this, Defendant points out that WC uses the same numbering system on its trading cards and that the designer of WC's cards testified that, in his mind, the numbering system did not implicate AAA Sports.  The Trustee, on the other hand, argues that there is evidence—testimony from Douglas Atkins, Jr.—that the numbering system constitutes other information identifying the Copyrights.  The Court agrees with the Trustee.

Here, there is evidence that indicates there is a factual dispute regarding whether the "SS-##" numbering system is CMI.  Section 1202(c) states that "the term "copyright management information" means . . . [i]dentifying numbers or symbols referring to such information . . . ."  17 U.S.C. § 1202(c)(7).  Douglas Atkins, Jr. testified that the "numbering system identifies that this card is a Stat Smasher, that's what the SS stands for" (Dkt. #130, Exhibit 2 at p. 19).  When asked, "How does the numbering system, which is listed here as SS-1, identify the author of the work?" Douglas Atkins, Jr. further testified that the "SS-##" on the cards "is a unique numbering system that identifies the card.  The SS stands for Stat Smasher, dash 1 is card number 1 . . . the SS is the

51

title of the work, Stat Smasher.  It's a unique numbering system that nobody else had done until we did it" (Dkt. #130, Exhibit 2 at p. 26).  Thus, there is evidence that the numbering system is identifying information that was conveyed in connection with the Copyrights and, therefore, is CMI as defined by § 1202(c).

### 4.  Whether the Parallel Stripes Ending in a Zigzag are CMI

Lastly, Defendant argues that the parallel stripes ending in a zigzag do not constitute CMI because they do not inform the public that anything was copyrighted or that AAA Sports was the owner of the Copyrights.  In support of this argument, Defendant again points to WC's use of parallel lines ending in zigzag strips.  The Trustee counters that the parallel lines and zigzags have become known as a symbol identifying the Stat Smashers card series created by AAA Sports.  Thus, the Trustee argues that they are a symbol identifying AAA Sports as the author of the cards.  The Court agrees with Defendant.

There is an absence of evidence to support the Trustee's contention that the parallel strips ending in a zigzag are CMI.  The Trustee points to Douglas Atkins, Jr.'s deposition testimony.  However, after reviewing the testimony pointed out by the Trustee in conjunction with the surrounding testimony, there is no fact issue.  The testimony reads:

Q. I'd like to talk about copyright management information.

A. All right.

Q. Can you explain how these double stripes at the bottom of the card identify the author of the work?

A. I can't explain that.

Q. Can you explain how the Stat Smashers logo identifies the author of the work?

A. The Stat Smashers design is the title of the work and the title of the work is my understanding is CMI, along with the name of the company and the author of the card and unique identifying numbers and symbols, so I guess the stripes would be a symbol that would identify the work.

52

(Dkt. #130, Exhibit 2 at pp. 25–26).  This is the only evidence offered by the Trustee.

Even after viewing the evidence and drawing inferences in a manner most favorable to the Trustee, the Court sees no genuine issue of fact.  That is, no reasonable juror could conclude, based on the evidence provided, that parallel stripes ending in a zigzag are a symbol identifying AAA Sports as the author of the Copyrights.  Hence, no reasonable juror could conclude, based on the evidence provided, that the parallel stripes ending in a zigzag are CMI.

### B.  Whether There is Evidence of Double Scienter as Required By the DMCA

Next, the Court turns to whether there is a genuine issue of material fact regarding Defendant's scienter.  Section 1202(a) and (b) contain a "double scienter" requirement.  *See* 17 U.S.C. § 1202(a)–(b).  Under § 1202(a), a plaintiff must prove that the defendant *knowingly* provided, distributed, or imported false CMI and that the defendant did so with the *intent* to induce, enable, facilitate, or conceal an infringement.  17 U.S.C. § 1202(a).  Similarly, under § 1202(b)(1), a plaintiff must prove that the defendant *intentionally* removed or altered CMI.  17 U.S.C. § 1202(b)(1).  And, under § 1202(b)(2) and (3), a plaintiff must prove that the defendant distributed or imported for distribution works or copies of works *knowing* that the CMI was removed or altered without the authority of the copyright owner or the law.  17 U.S.C. § 1202(b)(2)–(3).  In addition, all three subsections of § 1202(b) require a plaintiff also prove that the defendant violated § 1202(b) *knowing*, or having *reasonable grounds to know*, that the violation would induce, enable, facilitate, or conceal an infringement.  17 U.S.C. § 1202(b).

### 1.  Whether there is Evidence of Scienter Under § 1202(a)

With respect to § 1202(a), Defendant contends that there is no evidence of intent.  Instead, the evidence shows that Defendant mistakenly believed that, because AAA Sports abandoned its trademarks, the Copyrights were also abandoned.  Thus, Defendant believed that it was free to

create cards that would otherwise infringe on the Copyrights. *See* (Dkt. #112 at p. 18). Similarly, with respect to § 1202(b), Defendant argues that its "belief that the works were in the public domain prevents the Trustee from raising a genuine issue" as to the intent element of § 1202(b) (Dkt.#112 at p. 18). The Trustee, on the other hand, argues that the evidence shows there is a genuine issue of material fact regarding what Defendant intended and knew or should have known. The Court agrees with the Trustee.

First, despite Defendant's contentions, Defendant cannot rely on a purported mistake about whether AAA Sports abandoned the AAA Sports Trademarks to support its claim that there is no evidence it intended to violate the DMCA. At issue are the Copyrights owned by the Estate, not the AAA Sports Trademarks. With that in mind, it appears as though Defendant did not investigate the validity or ownership of the Copyrights whatsoever before creating the Infringing Works. Instead, Defendant conducted a search on whether AAA Sports' trademarks were abandoned and then relied on that knowledge to determine that no one owned the Copyrights (Dkt. #113, Exhibit 59 at pp. 6–7). But, as the Court has repeatedly pointed out, this is not a trademark infringement case. Defendant points to no caselaw, and the Court can find none, to support its proposition that abandoning a trademark has any effect on a cause of action related to copyrights. Whatever trademarks were or were not owned or abandoned by a third party to this case is irrelevant.

As the Court already discussed, copyright law is clear that the creator of a copyright "gains 'exclusive rights' in her work immediately upon the work's creation, including rights of reproduction, distribution, and display." *Wall-Street.com, LLC*, 139 S. Ct. at 887. This is true regardless of whether the owner registers their copyrights. *Id.* AAA Sports put the public on notice that it owned the Copyrights in the 1990s when it put a copyright notice on the Copyrights. So, Defendant was aware that AAA Sports owned the Copyrights and had exclusive rights to

reproduce, distribute, and display the Copyrights.  *See id.*  The rights were automatically assigned to the Estate when AAA Sports filed for bankruptcy.  17 U.S.C. § 541(a)(1).  To that end, there is evidence that Defendant, at the very least, knew it did not own the Copyrights because it did not create the Copyrights and was aware that someone else had created the Copyrights.

As to the 2020 Cards that displayed Defendant's CMI, there is a genuine dispute of material fact as to Defendant's knowledge that it was providing or distributing false CMI while intending to induce, enable, facilitate, or conceal an infringement.  Tre Hattier ("Hattier"), one of Defendant's card designers, testified that he was shown the Copyrights and was directed to make the 2020 Cards look like the 90s Stat Smashers cards (Dkt. #130, Exhibit 32 at p. 8).  Based on that direction, Hattier made replicas of the 90s Stat Smashers cards, i.e., the 2020 Cards (Dkt. #130, Exhibit 32 at p. 8).  Hattier also specifically stated that he took the Stat Smashers Copyright and reverse engineered it to create a version for Defendant that looked as close as possible to the original Stat Smashers Copyright, i.e., the 2020 Cards (Dkt. #130, Exhibit 32 at pp. 137–39).  After completing his replicas, Hattier testified that he put Defendant's CMI on the cards (Dkt. #130, Exhibit 32 at pp. 12–13).  According to Hattier, he puts CMI on every card he makes for Defendant because it puts the world on notice that Defendant created, designed, developed, and distributed that card (Dkt. #130, Exhibit 32 at p. 13).  Furthermore, in response to interrogatories, Defendant stated that it "drew inspiration from the 1992 Wild Card Stat Smashers card" (Dkt. #113, Exhibit 63 at p. 12).  There is evidence that Defendant put CMI on its reversed-engineered copies of the Copyrights through Hattier.  Defendant then distributed and sold the 2020 Cards.  *See* (Dkt. #130, Exhibit 35 at pp. 4–5).  Thus, there is evidence that Defendant knowingly provided and distributed false CMI and a genuine fact issue exists for trial.

Moreover, based on the summary judgment record, Defendant seems to concede that it infringed the Copyrights when it created the 2020 Cards.  Defendant simply did not believe that it could be sued for copyright infringement because AAA Sports was no longer operating.  *See* (Dkt. #130, Exhibit 12 at p. 12) ("Again, the only thing I can figure is that it was, again, a company that no longer existed and brands that no longer were, you know, protected in any way.").  Yet, the summary judgment record reveals that Defendant made no attempt to contact any of the principals from AAA Sports or the Trustee to determine who, if anyone, owned the Copyrights (Dkt. #130, Exhibit 12 at pp. 9–10); (Dkt. #130, Exhibit 12 at pp. 13–14) (Q: "And to be fair, Panini undertook no investigation as to the copyrights possessed by the trustee or AAA Sports before it designed the 2020 Stat Smasher card, correct?"   A: "Not that I am aware of."). Accordingly, Defendant's purported mistake is better couched as a mistake as to whether there was anyone who could or would sue them for any infringement.  Now, Defendant argues there is no evidence of intent or knowledge because it chose not to investigate who currently owned the Copyrights.  However, evidence that Defendant knew the copyrights were originally owned by AAA Sports and evidence that Defendant simply chose not to investigate whether the Copyrights were now owned by someone else before putting its CMI on the Copyrights creates a genuine issue of material fact as to Defendant's knowledge that its own CMI was false and as to its intent to induce, enable, facilitate, or conceal an infringement.

For the same reasons the Court concludes that there is a genuine issue of material fact as to Defendant's knowledge and intent relating to the 2020 Cards, the Court concludes that there is also a genuine issue of material fact as to Defendant's knowledge and intent with respect to the 2021 Cards.  The designer of the 2021 Cards was told to take a look at the 2020 Cards, which mirror the cards created by AAA Sports in the 1990s, before designing the 2021 Cards (Dkt. #130,

56

Exhibit 54 at p. 5).  This evidence, in conjunction with the evidence referenced above, indicates that there is a factual dispute regarding Defendant's knowledge and intent under § 1202(a) with respect to the 2021 Cards.  Accordingly, summary judgment as to the scienter requirement in § 1202(a) is not warranted.

### 2.   Whether there is Evidence of Scienter Under § 1202(b)

Defendant argues that it is not liable under § 1202(b) because its belief that the works were in the public domain prevents the Trustee from raising a genuine issue as to Defendant's scienter. Defendant argues that it believed the Copyrights were in the public domain because it thought the Copyrights were owned by a defunct company that had abandoned its trademarks.  However, as the Court pointed out in the previous section, this argument is a non-starter.  For the same reasons that the Court determined there is a fact issue regarding the intent and knowledge requirements in § 1202(a), the Court determines that there is also a fact issue regarding the intent and knowledge requirements in § 1202(b).  Accordingly, summary judgment as to the scienter requirement in § 1202(b) is not warranted.

### C.  Whether Defendant Provided False CMI

Next, the Court turns to whether Defendant can put CMI on works that are distinct from the Copyrights without violating § 1202(a) of the DMCA.  Defendant argues that the seven features identified as false CMI on the Infringing Works are not false CMI and do not violate the DMCA as a matter of law.  The seven allegedly false CMI are as follows:

1.  Defendant's copyright notice;

2.  Defendant's Certified logo;

3.  Defendant's name and Panini logo;

4.  Defendant's "Blitz" logo on its NFL Blitz trading card application;

5.   Defendant's name and title on the infringing products identified in the Complaint;

6.   Defendant's use of "Stat Smashers" on a Panini infringing products or materials; and

7.   Terms of use on Defendant's NFL Blitz trading card application.

More specifically, Defendant argues that it did not falsify CMI with respect to the Infringing Works for three reasons: (1) Defendant placed its copyright notice and terms of use on its own distinct works; in other words, there is an original work requirement under § 1202(a); (2) Defendant's use of its own name, trademarks, and logos on its own distinct works is permitted; and (3) the Stat Smashers Logo cannot be false CMI because AAA Sports abandoned the AAA Sports Trademarks.

The Court immediately disposes of the trademark abandonment argument.  As discussed throughout this order, the AAA Sports Trademarks are irrelevant to the Estate's causes of action related to the Copyrights.  Therefore, the only two issues the Court needs to address are whether there is an original work requirement and whether Defendant's use of its own name, trademarks, and logos violates § 1202(a).  These two issues are intertwined.  At bottom, Defendant argues that it cannot be held liable under the DMCA for distributing its own distinct work with its CMI attached, even if its work incorporates the Copyrights.  Under the current set of facts, the Court disagrees.

Before the Court may get into the substance of the analysis, however, the Court needs to address discrepancies between Defendant's arguments in its motion for summary judgment and reply brief, as well as Defendant's accusations towards the Trustee.  In Defendant's statement of issues within its motion, Defendant states that the Court must resolve "whether Defendant removed CMI from a copyrighted work when Defendant created its own works that are distinct from AAA Sports' copyrighted works," which is an issue that clearly goes to § 1202(b) given Defendant's use of the word removal (Dkt. #112 at p. 6).  However, in the body of its motion, Defendant fails to

argue or explain why it may remove CMI from the Infringing Works without violating § 1202(b). Rather, Defendant's motion focuses exclusively on § 1202(a).  Defendant made no argument regarding § 1202(b) until its reply brief, effectively waiving any argument regarding § 1202(b).

Moreover, in its reply brief, Defendant seems to misunderstand the limitations of the arguments it made in its motion and improperly calls the Trustee out for not addressing § 1202(b) (Dkt. #137 at pp. 7–8).  Defendant then accuses the Trustee of misstating the law (Dkt. #137 at pp. 7–8).  However, in making this accusation, Defendant misquotes and misrepresents the Trustee's argument.  The Trustee did not claim "that the DMCA 'does not require any remove [sic] or alternation whatsoever to establish a violation'" (Dkt. #137 at p. 8).  Instead, the Trustee stated that "[§] 1202(a) does not require any remove [sic] or alteration whatsoever to establish a violation," which is a correct statement of the law (Dkt. #129 at p. 6).

To make matters worse, it is Defendant itself that misstates the law and misrepresents the holdings of the cases it cites.  For example, although Defendant only references and cites § 1202(a) in its legal authority and argument, Defendant cites cases that deal exclusively with § 1202(b).  *See* (Dkt. #112 at pp. 15–17) (citing *Kirk Kara Corp. v. W. Stone & Metal Corp.*, No. 20-CV-1931, 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020); *Fischer v. Forrest*, 286 F. Supp. 3d 590 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020); *Kipp Flores Architects, LLC v. AMH Creekside Dev., LLC*, No. 21-CV-01158, 2022 WL 4352480 (W.D. Tex. Sept. 16, 2022)).  Defendant also consistently refers to the "DMCA" as though the DMCA does not contain multiple causes of action.  For instance, Defendant states that "the Trustee must show that 1) Defendant distributed the original copyrighted work and 2) falsified, altered, or removed CMI separate and apart from that work—it is not a DMCA violation if Defendant created a new work" (Dkt. #112 at p. 16). This improperly conflates the different requirements of each subsection in § 1202.   Under

§ 1202(a) and (b), there are five separate causes of action that a plaintiff can bring, all of which require different showings.   17 U.S.C. § 1202(a)–(b).   A defendant could be liable under § 1202(a)(1) for knowingly, and with the intent to induce, enable, facilitate, or conceal infringement, providing CMI that is false without being liable under § 1202(b)(1) because that same defendant did not intentionally remove or alter CMI without the authority of the copyright owner or the law.   *Id.* § 1202(a)(1)–(b)(1).   Importantly, despite Defendant's contentions, neither § 1202(a)(1) nor § 1202(b)(1) require a defendant to distribute anything.   *See id.*

All this to say, Defendant waived any argument with respect to § 1202(b) because Defendant did not make any arguments pertaining to § 1202(b) in its motion.   *United States v. Jackson*, 426 F.3d 301, 304 (5th Cir. 2005) ("Arguments raised for the first time in a reply brief . . . are waived.") (citing *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983).   With these initial matters addressed and out of the way, the Court now turns to whether Defendant violated § 1202(a) when it put its own CMI on works that are allegedly distinct from the Copyrights.

Another court in this district recently dealt with an identical argument.   In *Huffman*, the defendant argued that "distributing one's own work with CMI attached does not implicate section 1202(a)." 2020 WL 8678493, at *11.   According to the defendant, to implicate § 1202(a), it needed to affix CMI directly to one of the plaintiff's original works.   *Id.*   Ultimately, the court determined that there was no original work requirement inherent in § 1202(a).   *Id.* at *12–13.   The court reached this conclusion for three reasons.   First, the court held "that [§] 1202(a) is unambiguous. If someone with the specified intent provides false CMI, they have violated [§] 1202(a).   Nothing in the statute exempts derivative works or a defendant's own work." *Id.* at *12.   Second, the court held that the definition of CMI includes information conveyed in connection with *copies* of a work, and the definition of copies supports the notion that a copy includes more than just the original

work. *Id.* (citing 17 U.S.C. §§ 101, 1202(c)). Lastly, the court distinguished the cases cited by the defendant because they generally dealt with § 1202(b). *Id.*

Likewise, a court in the Southern District of Texas recently dealt with whether both § 1202(a) and (b) are restricted to falsification and removal or alteration in connection with identical copies of works." *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, __ F. Supp. 3d __, No. 4:22-CV-01914, 2023 WL 2719446, at *8 (S.D. Tex. Mar. 30, 2023). The court in *ADR* reached the same conclusion as *Huffman* for similar reasons. *Id.* *8–9. The court reviewed the statutory language of § 1202(a) and (b), as well as the definition of "CMI" in § 1202(c) and "copies" in § 101. *Id.* Ultimately, the court held that, "[b]ased on the plain wording of the statute, the Court is not persuaded that the DMCA includes an 'identical copy' requirement." *Id.* at *9. Different in this case, the Court determined that no section of the DMCA contained an original work or identical copy requirement.

This Court agrees with the holdings of *Huffman* and *ADR*. Looking at the unambiguous language of § 1202(a) and (c), as well as the definition of copies in the Copyright Act, there is no original work requirement. Section 1202(a) provides:

> (a) False copyright management information.—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—
>
>> (1) provide copyright management information that is false, or
>>
>> (2) distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a). And Section 1202(c) provides, in relevant part:

> (c) Definition.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202(c).  The language of § 1202(a) and (c) in no way indicate that there is an original work requirement.  Similarly, the definition of copies does not indicate an original work requirement.  Section 101 provides:

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

17 U.S.C. § 101.  This definition "strongly supports the notion that copies include more than just original work." *Huffman*, 2020 WL 8678493, at *12.  Indeed, copies include "material objects . . . from which the work can be perceived, reproduced, or otherwise communicated."  17 U.S.C. § 101.

Courts do not have the authority to add terms to an unambiguous statute.  *Huffman*, 2020 WL 8678493, at *12 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010); *Scales v. United States*, 367 U.S. 203, 211 (1961)); *Thomas v. Reeves*, 961 F.3d 800, 821 (5th Cir. 2020)).  Thus, because the statute is unambiguous, the Court need not look any further to determine that

there is no original work requirement in § 1202(a).  "If someone with the specified intent provides false CMI, they have violated section 1202(a).  Nothing in the statute exempts derivative works or a defendant's own work."  *Huffman*, 2020 WL 8678493, at *12.

Nevertheless, the Court points out that the line of cases upon which Defendant rests its argument is distinguishable.  The progeny of cases cited by Defendant all find their footing in *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352 (N.D. Fla. 2010).  In *Faulkner*, the defendant, a company that sells note packages to students, hired student note takers to provide it with lecture summaries and study materials from classes they attend.  *Id.* at 1355.  The defendant would then edit and publish those note packages for sale.  *Id.* at 1359.  The plaintiff's class was one of the classes that the student note takers attended.  *Id.*  Based on the student note takers' summaries and study materials, the defendant created and sold note packages related to the plaintiff's class.  *Id.*  After the plaintiff learned of this, he brought claims against the defendant for violating § 1202(a) and (b) of the DMCA, alleging that the defendant "removed [CMI] when it copied materials from the textbooks and film study questions into its note packages" and "intentionally published false [CMI] by printing "Einstein's Notes (C)" on its note packages."  *Id.*  The defendant argued that it did not remove CMI contained in the plaintiff's textbooks or film study questions because its information was gathered from the students' notes, not the plaintiff's materials.  *Id.*

The court determined that the defendant did not remove CMI from the plaintiff's copyrighted materials because it created a different product using materials from the note takers.  *Id.*  The copyrighted materials were "copied into a different form" and then further edited into yet another different form when they were "incorporated into the note packages."  *Id.*  Thus, the note packages were an entirely different product, albeit a product that contained information that was

also found in the plaintiff's copyrighted works.  *Id.*  "[W]hen 'student note takers simply took notes from [a] course and those notes were' aggregated for resale, they did not 'remove' [CMI] from the textbook within the meaning of the statute."  *GC2 Inc. v. Int'l Game Tech., IGT, Doubledown Interactive LLC*, 391 F. Supp. 3d 828, 843 (N.D. Ill. 2019) (distinguishing *Faulkner*).

In *Faulkner*, the court focused its analysis on § 1202(b).  Nevertheless, in one brief paragraph at the end of its analysis, the court noted that the defendant also did not add false CMI by printing its own CMI on the note packages.  *Faulkner*, 756 F. Supp. 2d at 1359–60.  However, this does not change this Court's conclusion.  At bottom, *Faulkner* only stands for the proposition that copying notes or questions does not alter or remove CMI from a professor's textbooks.  As one district court put it, *Faulkner* in no way "stands for the broad proposition that derivative or collaborative works are categorically excluded from protection under the DMCA's provision for removal of [CMI]."  *GC2*, 391 F. Supp. 3d at 843.

Defendant also specifically points to *Michael Grecco Productions., Inc. v. Time USA, LLC*, No. 20-CV-4875, 2021 WL 3192543 (S.D.N.Y. July 27, 2021).  In *Grecco,* one of the defendants, Time USA, LLC, is the "owner of the trademark for the American weekly news magazine and website, 'Time.'"  *Id.* at *1.  The plaintiff and Time entered into a licensing agreement for each photograph that allowed Time to use the photographs on its covers.  *Id.*  The licenses stated, in relevant part, that (1) "[o]wnership of the photograph and the copyright in it remain with" the photographer, (2) Time is allowed to do "customary editorial work to incorporate the photograph into the cover, including . . . overlaying text and the TIME logo," and (3) Time "retain[ed] the right to reproduce the cover of the Magazine as it appears, in any media, for any purpose, in perpetuity without additional payment."  *Id.* at*2.  Based on the parameters of the license, Time created a cover for its magazine that included the plaintiff's photographs and overlayed the

photographs with its logo, its trademarked red border, and text.  *Id.* at *5.  Later, Time began working with Pixels.com, LLC, another defendant in the case.  Time used Pixel to help sell its products, which included the covers displaying the plaintiff's photographs.  *Id.* at *2.  On Pixel's website, the artist of the covers is listed as "Time," and a preview of the covers displays a watermark that superimposes the name of one of Pixel's websites.  *Id.*  The plaintiff accused the defendants of violating § 1202(a) because of the TIME logo, the red border, and the watermark.  *Id.*  The court disagreed with the plaintiff, holding that neither defendant violated § 1202(a).  *Id.* at *5.

The court determined that the plaintiff improperly conflated the photographs with the covers.  *Id.*  Time created unique covers that incorporated the photographs and the logo, trademark, and text.  *Id.*  These attributions and Pixels's watermark represent the defendants' reproduction rights with respect to the cover, not the photographs.  *Id.*  According to the court, "[a]t no time did the defendants claim ownership of the [p]hotographs."  *Id.*  Moreover, the licensing agreements between Time and the plaintiff specifically draw this distinction.  *Id.*  In one sentence, the court noted that "[i]n any event, a party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under Section 1202(a), even if the party's work incorporates the copyright holder's work."  *Id.*  This Court agrees with the court in *Grecco* but does not view it as holding that there is an original work requirement in § 1202(a).  Instead, the holding merely stands for the proposition that when an individual incorporates copyrights that it has a license to use into its own works those new works are distinct works for purposes of false CMI under § 1202(a).  This Court's view is further strengthened by the court holding in *Grecco* that the defendants did not infringe the plaintiff's copyrights.  *Id.*

Here, the facts are readily distinguishable from *Faulkner* and *Grecco*.  For one, there is evidence that Defendant sought to replicate the Copyrights.  Indeed, as the Court notes throughout this order, the summary judgment evidence reflects that Defendant viewed the Copyrights and then set out to make their own cards, replicating and, in some cases, modifying the Copyrights.  Additionally, Defendant had no licensing agreement to use the Copyrights.  Therefore, the Infringing Works are not distinct works merely incorporating copyrights that Defendant has a license to use.  To the extent Defendant argues that, because it modified the Copyrights, creating a derivative work, such that the CMI on the Infringing Works was not false, that argument is without merit.  In addition, to the extent Defendant argues that its works are distinct because they merely incorporate the Copyrights, that argument is also without merit.  Summary judgment is not warranted.  Whether Defendant violated § 1202(a) is a question of fact for the jury.  *Huffman*, 2020 WL 8678493, at *13.

## V.   Defendant's Defenses

Defendant and the Trustee both filed motions for summary judgment relating to Defendant's affirmative defenses (Dkt. #110; Dkt. #116).  The Trustee filed a motion for summary judgment requesting the Court dismiss Defendant's copyright abandonment, waiver, de minimis infringement, laches, estoppel, and copyright misuse defenses (Dkt. #116).[8]  Defendant, on the other hand, filed a motion addressing only its judicial estoppel and abandonment defenses (Dkt. #110).  The Court will address each issue in turn, beginning with the issue of abandonment.

---

[8] In its motion, the Trustee also argues that Defendant's affirmative defense that there is an absence of evidence to support substantial similarity between Defendant's Works and the Copyrights is without any merit and should be adjudicated in the Trustee's favor as a matter of law at this juncture (Dkt. #116 at p. 29).  However, substantial similarity is not an affirmative defense because it is an element of the Trustee's copyright infringement claim against Defendant.  *Petrolink Servs., Inc.*, 965 F.3d at 373.  Thus, the burden is on the Trustee to prove substantial similarity. *Id.*

### A.  Whether the Defenses of Abandonment or Waiver Are Applicable

The parties filed competing motions for summary judgment regarding whether the Copyrights were abandoned.[9]  The Trustee argues that the Court should grant summary judgment in his favor on the issue of abandonment because the Estate did not intend to abandon the Copyrights and the Estate did not inadvertently abandon the Copyrights by inaction.  Defendant, on the other hand, argues that the Estate abandoned the Copyrights because AAA Sports abandoned the AAA Sports Trademarks.  Also related to AAA Sports, Defendant argues that the Estate abandoned the Copyrights because AAA Sports knew it had copyrights but did not inform the bankruptcy court of those copyrights.  Lastly, Defendant argues that the Estate abandoned the Copyrights by inaction because a third party, WC, is currently infringing on the Copyrights, and the Estate has taken no action against it.

The issues the Court must resolve are (1) whether the Estate abandoned the Copyrights because AAA Sports abandoned the AAA Sports Trademarks, (2) whether the Estate intended to abandon the Copyrights, and (3) whether the Estate abandoned the Copyrights by inaction.[10]  The Court will address each issue in turn.

---

[9] Both parties also disagree as to whether the Trustee abandoned the Copyrights during the original bankruptcy proceedings.  The Court already resolved this issue in its constitutional standing analysis.  Accordingly, the Court need not address this issue again.

[10] The issue of abandonment by inaction is one in the same with the issue of waiver because abandonment by inaction encompasses certain waiver principles.  *Malibu Media, LLC v. Schmidt*, No. 19-CV-00599, 2020 WL 5351079, at *2 (W.D. Tex. Sept. 1, 2020) ("It used to be the case that abandonment could only be shown by proving the copyright proprietor intended to surrender the rights in a work he so deliberately perfected . . . now a right such as copyright may be waived by inaction." (cleaned up) (internal citations omitted)); *see also Gillani Consulting, Inc. v. Ferguson Enters., Inc.*, No. 3:07-CV-1488, 2010 WL 11583174, at *7 (N.D. Tex. June 8, 2010) ("Although waiver itself is not a defense in a copyright infringement suit, abandonment of the copyright is an effective defense and is the particular copyright doctrine closest to waiver." (citing 4 *Nimmer on Copyright* § 13.06)).  Therefore, the parties' arguments on this point address both the waiver and abandonment defenses.

### 1. Whether the AAA Sports Trademarks Have Any Bearing On the Estate's Copyright Causes of Action

Defendant filed a motion for summary judgment asking the Court to grant summary judgment on the issue of abandonment because AAA Sports abandoned the AAA Sports Trademarks.  Defendant's contention that a party who abandoned its trademark applications and registrations inherently abandoned its copyrights has no basis in the law.  Trademark law and copyright law both fall under the umbrella of intellectual property.  Copyright infringement, however, is brought under the Copyright Act and is an entirely separate and distinct cause of action from trademark infringement, which is brought under the Lanham Act.  15 U.S.C. §§ 1051 *et seq.*  Defendant provides no caselaw in support of its proposition that a third party's actions with respect to a trademark have any effect on a copyright owner's exclusive rights.  Nor can the Court find any.  Thus, Defendant's argument that the Estate abandoned its rights in the Copyrights simply because AAA Sports abandoned the AAA Sports Trademarks is a non-starter.  Accordingly, insofar as Defendant's motion for summary judgment argues that AAA Sports abandoned the AAA Sports Trademarks, summary judgment is not warranted.

### 2. Whether the Estate Intended to Abandon the Copyrights

The parties filed competing motions for summary judgment regarding the Estate's intent, or lack thereof, to abandon the Copyrights.  Defendant argues that the Estate intended to abandon the Copyrights because AAA Sports did not disclose the Copyrights to the bankruptcy court, and neither the Trustee nor AAA Sports have used the Copyrights since the 1990s.  Defendant further argues that the Trustee released all the cards to the NFL and the NFLPA so the trading cards could be destroyed.  Thus, Defendant concludes that AAA Sports and the Trustee completely washed their hands of the Copyrights.  The Trustee argues that Defendant cannot point to any overt acts by AAA Sports or the Estate which are sufficient to support that the Estate intended to abandon

the Copyrights.  To that point, the Trustee argues that Defendant's allegations that AAA Sports filed for bankruptcy, stopped doing business, and attempted to liquidate its assets in the bankruptcy case do not establish abandonment as a matter of law.

"Abandonment requires evidence of intent by the copyright holder to surrender rights in [its] work." *Gillani*, 2010 WL 11583174, at *7 (citing *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 898 (5th Cir. 1972)).  Thus, insofar as Defendant's argument pertains to AAA Sports' actions after the Copyrights became property of the Estate, those actions are not relevant because AAA Sports no longer owned the Copyrights.  The relevant actions are the Estate's actions; that is, the Trustee's actions taken on behalf of the Estate.  Further, "[e]vidence of the necessary intent to abandon must be established by an overt act that indicates the copyright owner's desire to surrender its rights." *Id.* (citing 4 *Nimmer on Copyright* § 13.06; *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 486 n.6 (5th Cir. Unit B Nov. 1981)).  So, Defendant must present evidence that the Trustee took an overt act that indicates the Estate's desire to surrender its rights.  Defendant points to no such evidence.  The Trustee was not aware of the Copyrights until September 2021 (Dkt. #117, Exhibit 16 at pp. 6–7).  Therefore, the Trustee could not have intended to surrender the Estate's rights in the Copyrights until September 2021.  Indeed, you cannot intend to abandon something you are not aware exists.  Moreover, upon learning of the Copyrights, the Trustee has only taken actions demonstrating the Estate's desire to protect, not surrender, its rights (Dkt. #117, Exhibit 16 at pp. 6–8).

Defendant did not establish that the Estate intended to abandon the Copyrights as a matter of law.  Thus, summary judgment in favor of Defendant on Defendant's defense of intentional abandonment is not warranted.  The Trustee, on the other hand, pointed out an absence of evidence to support Defendant's intentional abandonment defense.  In response, Defendant did not put forth

particular facts indicating that there is a genuine issue of fact.  Accordingly, the Trustee established that the Estate is entitled to summary judgment on Defendant's intentional abandonment defense.

### 3.  Whether the Estate Waived or Abandon its Rights in the Copyrights Through Inaction

Next, the Court turns to the issue of whether the Estate abandoned the Copyrights by inaction.  Abandonment is a valid defense in a copyright infringement case and is akin to waiver. *Malibu Media, LLC v. Martin*, No. 18-CV-4425, 2019 WL 3802678, at *3 (S.D. Tex. Aug. 13, 2019).  It used to be the law in the Fifth Circuit that, to establish the defense of abandonment, a party must provide "evidence of intent by the copyright holder to surrender rights in [its] work." *Id.* (internal citations omitted).  Specifically, a party needed to prove there was an overt act by the copyright holder "that indicates the copyright owner's desire to surrender its rights." *Id.* (internal citations omitted).  Now, however, "[a] right such as copyright may be waived by inaction." *Veeck v. S. Bldg. Code Cong. Int'l Inc.*, 241 F.3d 398, 409 (5th Cir. 2001), *rev'd on other grounds*, 293 F.3d 791, 793, 806 (5th Cir. 2001) (en banc), *cert. denied*, 537 U.S. 1043 (2002) (citing *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1119 n.5 (5th Cir. 1998)).  "Copyright also may be waived as the result of a particular act, even if waiver was not the intended result." *Id.* (citing *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 48 (5th Cir. 1995)).

Defendant argues that the Wild Card logo and Stat Smashers Logo are depicted on WC's trading cards without any license from the Estate.  According to Defendant, the summary judgment evidence demonstrates that WC manufactured millions of cards with the Wild Card logo on them (Dkt. #110 at p. 11).  Yet the Trustee has not initiated a lawsuit against WC.  Thus, Defendant contends that the Trustee cannot bring a cause of action against Defendant for copyright infringement because the Estate abandoned (or waived) its rights by inaction.  The Trustee, on the other hand, counterargues that it is not required to sue every potential infringer in order to preserve

the Estate's ownership over the Copyrights.  The Trustee further argues that there is no evidence to support the proposition that the Estate abandoned the Copyrights by inaction because he has not brought suit against WC.  Therefore, according to the Trustee, he is well within his rights to bring these claims against Defendant.  The Court agrees with the Trustee.

Here, there is no evidence that the Estate waived or abandoned its rights by failing to act. The evidence that Defendant points to demonstrates that WC produces and sells cards that contain the Wild Card logo.  The Wild Card logo, however, is not included in any of the Copyrights.  On the contrary, it is specifically excluded from each of the Copyrights.  As to the Stat Smashers Logo, the evidence demonstrates that WC planned to develop new Stat Smasher cards—even going as far as hiring a designer to create the new cards and releasing a flyer—but ultimately decided not to (Dkt. #117, Exhibit 60 at pp. 4, 6; Dkt. #130, Exhibit 9 at p. 8; Dkt. #113, Exhibit 48 at p. 14; Dkt. #113, Exhibit 29 at pp. 15–16).  Before actually printing or selling any cards, WC decided not to move forward with the new Stat Smashers series and replaced it with a new series of cards called the Weekend Warrior (Dkt. #130, Exhibit 9 at pp. 9–10).  Accordingly, there is no evidence that WC is producing or selling a Stat Smasher card series that infringes on the Copyrights.  With this in mind, Defendant essentially argues that a copyright owner waives its right to bring an infringement action against anyone when the owner does not sue an individual that merely considered infringing on his or her rights.  The Court finds these circumstances insufficient to support the defense of abandonment by inaction.  Accordingly, there is also no evidence that the Estate abandoned or waived its right to enforce its exclusive rights under the Copyright Act.

Defendant did not establish that the Estate abandoned the Copyrights by inaction as a matter of law.  Thus, summary judgment in favor of Defendant on its defense of abandonment by inaction (or waiver) is not warranted.  The Trustee, on the other hand, pointed out an absence of

evidence to support Defendant's abandonment by inaction defense.  In response, Defendant did not put forth particular facts indicating that there is a genuine issue of fact.  Accordingly, the Trustee established that the Estate is entitled to summary judgment on Defendant's abandonment by inaction (or waiver) defense.

### B.  Whether the Judicial Estoppel Defense is Viable

Next, the Court turns to the issue of judicial estoppel.  The parties filed competing motions for summary judgment on Defendant's judicial estoppel defense.  Defendant argues that the doctrine of judicial estoppel applies to the Estate's claims because AAA Sports knew it owned the Copyrights when it declared bankruptcy but did not schedule the copyrights in the original bankruptcy proceeding.  Defendant further argues that AAA Sports' failure to disclose the copyrights was not inadvertent.  Thus, Defendant concludes that the Trustee's current position is plainly inconsistent with the position AAA Sports took in the bankruptcy court, and judicial estoppel applies.  With respect to the Trustee, Defendant argues that the Trustee is also judicially estopped from pursuing copyright infringement for the benefit of AAA Sports' creditors because the allegedly unusual circumstances of this case indicate the Trustee is not innocent in his pursuit of a benefit to AAA Sports' creditors.  The Trustee counterargues that there is no evidence to support even a single element of the judicial estoppel defense.  Additionally, the Trustee argues that there is no proof of improper behavior on his part and that Defendant can point to no evidence supporting its contention that unusual circumstances are present here.  The Court agrees with the Trustee.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Reed v. City of Arlington*, 650 F.3d 571, 573–74 (5th Cir. 2011) (quoting 18 James Wm. Moore et al.,

Moore's Federal Practice § 134.30 at 63 (3d ed. 2011)).  "In a bankruptcy case, judicial estoppel

both deters the dishonest debtors—whose failure to fully and honestly disclose all their assets

undermines the integrity of the bankruptcy system—and protects the rights of creditors to an

equitable distribution of the estate's assets."  *In re Jackson*, No. 06–36268, 2012 WL 3071218, at

*26 (Bankr. S.D. Tex. July 27, 2012).  In determining whether judicial estoppel prevents a party

from asserting a claim, courts consider three factors: (1) the party against whom judicial estoppel

is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court

accepted the prior position; and (3) the party did not act inadvertently."  *Id.*  And, although judicial

estoppel may prevent a bankruptcy trustee from pursuing claims, that is not generally the case.

*See generally Reed v. City of Arlington* ("*Reed II*"), 650 F.3d 571 (5th Cir. 2011).  "[A]bsent

unusual circumstances, an innocent trustee can pursue for the benefit of creditors a judgment or

cause of action that the debtor fails to disclose in bankruptcy."  *Id.* at 573.

In *Reed II*, the Fifth Circuit gathered the latest Fifth Circuit cases where a plaintiff asked a

court to apply judicial estoppel to a bankruptcy trustee:

> Declining to estop the Trustee is consistent with the trio of judicial estoppel cases
> we have hitherto decided in the bankruptcy context.  The material facts of this case
> are indistinguishable from those of *Kane*, our most recent opinion.  Both cases
> involve a Chapter 7 trustee who substituted into a cause of action to pursue a claim
> that the debtor had wrongly concealed during the bankruptcy proceeding.  Neither
> trustee abandoned the claim at any point.  In both situations, estopping the trustee
> would unnecessarily deny the estate's innocent creditors their right to seek some
> share of the recovery.  Faced with the identical question raised here, we held in
> *Kane* that the trustee of a bankruptcy estate should not be judicially estopped from
> pursuing such a claim.  We reasoned that the Kanes' personal injury claim was an
> asset of the estate that the trustee had never abandoned, and that the only way the
> creditors would be harmed is if judicial estoppel were applied to bar the trustee
> from pursuing the claim on behalf of the estate.
>
> In *Superior Crewboats Inc. v. Primary P & I Underwriters*, we precluded the
> debtors themselves from pursuing a lawsuit for their own benefit that they had
> failed to disclose in their bankruptcy schedules.  The debtors incorrectly told the
> bankruptcy trustee that the claim was proscribed by the statute of limitations; the
> trustee agreed, and formally abandoned the claim under the Bankruptcy Code.

Upon abandonment, the estate's interest in the claim reverted to the debtors, who were then properly estopped from benefiting from their deception.  Here, the Trustee has not abandoned the estate's interest in the judgment against the City; she is therefore entitled to pursue the judgment as the real party in interest for the benefit of the estate's creditors.

In *Browning Manufacturing v. Mims* (*In re Coastal Plains, Inc.*), we judicially estopped a debtor's successor from collecting a judgment it obtained by pursuing, outside of bankruptcy, an undisclosed claim that was part of the debtor's estate.  The trustee in that case was also estopped based on a sharing agreement with the debtor's successor in which the debtor's successor stood to receive 85 percent of any recovery, while the estate would receive only 15 percent.  Key to our application of judicial estoppel in *Coastal Plains* was the fact that recovery would benefit the individual who actually perpetrated the bankruptcy fraud in great disproportion to the bankruptcy estate.  No such equitable concerns inhere in this case, where Lubke does not stand to benefit from recovery of a judgment even if there is a surplus after all debts and fees have been paid.

650 F.3d at 577–78 (internal citations omitted) (citing *Kane*, 535 F.3d 380*; Superior Crewboats Inc. v. Primary P & I Underwriters*, 374 F.3d 330 (5th Cir. 2004); *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999)).  Here, as in *Reed II*, *Kane*, and *Superior Crewboats*, the facts of this case do not indicate that the Court can apply judicial estoppel to AAA Sports or should apply judicial estoppel to the Trustee.

First, there is no evidence to support Defendant's argument that the Trustee, AAA Sports, or members of the Atkins family are colluding.  According to Defendant, the evidence conclusively establishes that the Trustee formed an alliance with AAA Sports' former owners "to benefit those owners while using this action and the bankrupt estate as a cudgel to harm the competition," i.e., Defendant (Dkt. #110 at p. 20).  Defendant's only support for this proposition is the fact that the Trustee is represented by the same attorneys that have represented the owners of AAA Sports.  The Court disagrees that this is evidence of collusion or culpable behavior on the part of the Trustee.  Defendant presents no evidence of an agreement or an alliance between the Trustee and the Atkins family.  Defendant also presents no evidence that the Trustee is working to benefit AAA Sports rather than the creditors.  There is no evidence of any unusual circumstances whatsoever.  Instead,

74

the facts of this case and the summary judgment record before the Court both demonstrate that this is another case where a trustee became aware of unscheduled and unadministered assets of a bankruptcy estate and then reopened the proceedings to administer those assets for the benefit of the creditors.

Second, AAA Sports' conduct, which may very well give rise to judicial estoppel, is distinct from the Trustee's action. *See id.* at 574–75 ("[W]hile [the debtor] himself was properly estopped for his dishonesty, his post-petition misconduct does not adhere to the Trustee, who received the judgment asset free and clear of a defense that arose exclusively from [the debtor's] post-petition actions."). To be sure, AAA Sports did not disclose the Copyrights during the original bankruptcy proceedings, but, as the Court pointed out, AAA Sports is not a party to this case and never has been. AAA Sports never brought a copyright infringement claim against Defendant, and the Trustee is not suing on behalf of AAA Sports. Nor is the Trustee pursuing claims on behalf of the Atkins family. The Trustee is suing on behalf of the Estate for the benefit of the creditors. Accordingly, AAA Sports' position in a previous lawsuit is irrelevant to this lawsuit. At issue here are the actions of the Estate. For those same reasons, any attempt to apply an affirmative defense to AAA Sports, in this case, is misguided. Whether AAA Sports is judicially estopped from receiving any excess funds once the creditors are paid is an issue for the bankruptcy court to determine, not this Court.

Defendant did not establish that judicial estoppel bars the Estate's claims as a matter of law. Thus, summary judgment in favor of Defendant on Defendant's defense judicial estoppel is not warranted. The Trustee, on the other hand, pointed out an absence of evidence to support Defendant's judicial estoppel defense. In response, Defendant did not put forth particular facts

indicating that there is a genuine issue of fact.  Accordingly, the Trustee established that the Estate is entitled to summary judgment on Defendant's judicial estoppel defense

### C.  Whether the De Minimis Infringement Defense is Viable

Next, the Court turns to the issue of de minimis infringement.  The Trustee filed a motion for summary judgment requesting the Court dismiss Defendant's de minimis infringement claim. "The de minimis doctrine provides that if unauthorized copying is sufficiently trivial, 'the law will not impose legal consequences.'"  *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 639 (S.D. Tex. 2007) (quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172–73 (2d Cir. 2001)).  With respect to copyrights, an infringement is "de minimis" when copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity.  *Id.* (quoting *Ringgold v. Black Enter. Television, Inc.*, 126 F.3d 70, 74–75 (2d Cir. 1997)); *see also Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998).  "In determining whether or not the allegedly infringing work falls below the quantitative threshold of substantial similarity to the copyrighted work, courts often look to the amount of the copyrighted work that was copied, as well as (in cases involving visual works) the observability of the copyrighted work in the allegedly infringing work."  *Id.* (cleaned up) (internal citations omitted).  Essentially, "[t]he qualitative element looks at the amount of the copyrighted work that is copied."  *Id.* (citing *Sandoval*, 147 F.3d at 217.

The Trustee argues that the Court should grant summary judgment in the Estate's favor on this defense.  However, the Court concluded that whether the infringing products are substantially similar to the Copyrights is a question best left to the jury.  The de minimis infringement defense is wrapped up in the substantially similar determination.  The genuine issues of material fact that plague the substantial similarity element also plague Defendant's claim that the infringement was


de minimis.  Thus, the Court concludes that the issue of de minimis infringement is also best left to the jury, and summary judgment in favor of the Trustee on this issue is not warranted.

### D.  Whether the Defense of Laches is Viable[11]

According to the Copyright Act, "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  Despite this statute of limitations, in extraordinary circumstances, the equitable defense of laches may still apply to a copyright infringement claim.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("[The statute of limitations] regime leaves 'little place' for a doctrine that would further limit the timeliness of a copyright owner's suit.  In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant . . . curtailment of the relief equitably awardable." (internal citations removed)); *see also Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 271, 272 (5th Cir. 2020) (recognizing the Supreme Court's holding that "prejudicial delay could, in 'extraordinary circumstances,' result in 'curtailment of the relief *equitably awardable*' 'at the very outset of the litigation'" (emphasis in original)).  This is because "laches is 'gap-filling, not legislation overriding.'"  *Kayne Anderson*, 948 F.3d at 272.

As an exemplar, the Supreme Court, in *Petrella*, pointed to a Sixth Circuit case, *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (2007).  *Petrella*, 572 U.S. at 685.  In *Chirco*, extraordinary circumstances existed where "owners of a copyrighted architectural design, although

---

[11] As an initial matter, Defendant argues that laches applies to AAA Sports because "AAA Sports sat on its alleged rights for decades and concealed them from the bankruptcy court, creditors, and the Trustee" (Dkt. #124 at p. 20). But, as discussed, AAA Sports is not a party to this case, and AAA Sports is not the owner of the Copyrights. Accordingly, it is of no consequence whether AAA Sports is subject to laches.  Further, laches is concerned with the timeliness of a claim, i.e., whether there was a delay in bringing suit.  *Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 708. Despite Defendant's contentions, laches is not concerned with what AAA Sports did or did not disclose to the bankruptcy court.  Defendant cites no caselaw in support of this contention, and the Court can find none.  Indeed, the length of time in which it took AAA Sports to reveal undisclosed assets is irrelevant to whether the Estate delayed in bringing suit after its copyright infringement claim accrued.

aware of an allegedly infringing housing project, delayed suit until the project was substantially constructed and partially occupied." *Id.* at 685–86 (emphasis added) (citing *Chirco*, 474 F.3d at 236).  More so, the Supreme Court went on to point out that, "in the face of an unexplained delay in commencing suit, [it] would [not] be equitable to order 'total destruction' of a book already printed, packed, and shipped." *Id.* at 686 (citing *New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584–585 (1989)).  Thus, in *Chirco*, the extraordinary circumstances were the plaintiff's demand for the destruction of 168 completed housing units.  *Id.* at 685–86; *see also Cadence Design Sys., Inc. v. Syntronic AB*, No. 21-CV-03610, 2022 WL 1320629 (N.D. Cal. May 3, 2022) (holding that laches is applicable in a copyright infringement case when the plaintiff (1) knew of the infringing activity for six years before filing suit and (2) requested that the court impound and destroy any products produced, designed, or manufactured using the copyrighted software).

The Trustee argues first that laches is barred because he brought suit within the applicable three-year statute of limitations period under the Copyright Act.  Second, the Trustee argues that he initiated suit against Defendant promptly upon learning of Defendant's infringement.  Indeed, according to the Trustee, the Trustee first learned of the infringement in September 2021, and immediately began taking steps that would allow him to initiate suit against Defendant (Dkt. #117, Exhibit 16 at pp. 6–8).  The Trustee informed the United States Trustee that the bankruptcy case needed to be reopened in order to administer undisclosed assets (Dkt. #117, Exhibit 16 at pp. 10–13).  On September 22, 2021, the United States Trustee filed a motion to reopen the bankruptcy case (Dkt. #117, Exhibit 50).  On October 20, 2021, the bankruptcy court granted the motion, and the case was reopened (Dkt. #117, Exhibit 51 at p. 2).  The Trustee was then reappointed as the trustee of the Estate on October 26, 2021 (Dkt. #117, Exhibit 3 at p. 6; Dkt. #117, Exhibit 16 at pp. 12–13).  On November 20, 2021, the Trustee filed an application with the bankruptcy court to

Employ and Retain Cole Schotz P.C. as Special Litigation Counsel to Prosecute Certain Intellectual Property Claims, i.e., to file suit against Defendant for violations of the Copyright Act and the DMCA related to the Copyrights (Dkt. #117, Exhibit 52).  On December 28, 2021, the bankruptcy court authorized the Trustee to employ and retain Cole Schotz, P.C. as counsel (Dkt. #117, Exhibit 53).  The Trustee then filed suit on behalf of the Estate on February 10, 2022, only five months after he learned of possible infringement by Defendant (Dkt. #1).  Thus, there is no evidence to support the claim that the Trustee delayed.  On the contrary, the evidence demonstrates that the Trustee immediately began taking steps to initiate a lawsuit against Defendant for alleged violation of the Copyright Act and the DMCA.  The Court agrees.  Laches is inapplicable to this case.

The Trustee brought suit on the Estate's behalf within the limitations period; accordingly, the equitable defense of laches is inapplicable unless this is a case that constitutes extraordinary circumstances.  *Kayne Anderson*, 948 F.3d at 271 ("Congress precluded the equitable defense of laches in copyright cases by providing a three-year statute of limitations." (citing *Petrella*, 572 U.S. at 668)).  However, there is no evidence of any actual delay in bringing suit or extraordinary circumstances.  The copyright infringement claim did not accrue until Defendant first infringed. *Petrella*, 572 U.S. at 671 ("A copyright claim thus arises or "accrue[s]" when an infringing act occurs.").  The 2020 Cards were released in August of 2020 (Dkt. #113, Exhibit 63 at p. 7).  So, the copyright infringement claim as to the 2020 Cards did not accrue until August 2020.  The 2021 Cards were released in August of 2021 (Dkt. #113, Exhibit 63 at p. 7).  So, the copyright infringement claim as to the 2021 Cards did not accrue until August 2021.  The Trustee did not learn of the Copyrights or the infringement until the beginning of September 2021, after both the 2020 and 2021 Cards were released for sale (Dkt. #117, Exhibit 3 at p. 24).  As discussed, the

Trustee then immediately notified the United States Trustee of the Copyrights and after the bankruptcy case was reopened and the Trustee was reappointed, the Trustee received approval to retain counsel to initiate suit against Defendant (Dkt. #117, Exhibits 50–52).  All of this was done within roughly three and a half months.  The Trustee then filed suit on February 10, 2022, which was within roughly five months of when the Trustee first learned of the alleged infringements by Defendant (Dkt. #1).  Accordingly, there is no evidence that the Trustee knew of the infringement but waited to file suit until Defendant had made both the 2020 and 2021 Cards.

In its response, Defendant did not cite to any facts which would indicate there is any fact issue as to Defendant's alleged delay, or lack thereof.  Instead, Defendant argues that laches applies because the Trustee cannot assert legal claims that AAA Sports "abandoned and is equitably estopped from pursuing" (Dkt. #124 at p. 20).  According to Defendant, this means that "[t]he public, including the Defendant, is shielded by the doctrine of laches, including based on AAA Sports not only sitting on its alleged copyrights, but denying their existence under oath, twice" (Dkt. #124 at p. 20).  However, the Estate is the owner of the Copyrights, and Defendant has not established that the Estate abandoned the Copyrights.  Whatever actions AAA Sports did or did not take over two decades prior in the bankruptcy proceedings is of no consequence to the current case or the defense of laches.  Defendant's argument pertains in no way to the Trustee's alleged delay in bringing suit.

The Trustee pointed out an absence of evidence to support Defendant's claim that the Trustee delayed such that laches should apply.  In response to the Trustee pointing out an absence of evidence, Defendant did not put forth particular facts indicating that there is a genuine issue for trial.  Thus, summary judgment in favor of the Trustee on Defendant's laches defense is warranted.

### E.  Whether the Defense of Copyright Misuse is Viable[12]

Copyright misuse is an equitable defense, "which prevents a culpable plaintiff from prevailing in an action for the infringement of a misused copyright . . . ."  *Veeck*, 241 F.3d at 409. Copyright misuse "'forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant.'" *Id.* (quoting *DSC Comm'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 601 (5th Cir. 1996)).  "This doctrine–which has its historical roots in the unclean hands defense–bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792 (5th Cir. 1999) (quotation omitted).  When a defendant proves copyright misuses, the defendant "can be excused from any liability for infringement and even be allowed to continue the infringement based upon the behavior of the copyright owner with respect to the copyright."  2 Howard B. Abrams and Tyler T. Ochoa, *The Law of Copyright* § 16:2 (last updated October 2022).  However, Copyright misuse does not invalidate the copyright.  *Prac. Mgmt. Info. Corp. v. Am. Med. Assoc.*, 121 F.3d 516, 520 n.9 (9th Cir. 1997).

---

[12] Defendant also argues that the defense of copyright misuse is applicable because "AAA Sports' conduct is the epitome of copyright misuse" (Dkt. #124 at p. 20).  Indeed, according to Defendant:

> AAA Sports' conduct is the epitome of copyright misuse: deny that any copyrights exist to a court so as to deprive creditors of the alleged assets, then decades later use those alleged copyrights for your own personal gain–dupe the Court, dupe the creditors, dupe the trustee and then make profit, while also placing a hidden minefield for actual manufactures who, based on the public record, reasonably believed that the entity AAA Sports was defunct, that there were no copyrights and that the Trustee was discharged. Through this action, the Plaintiff—ostensibly acting for a bankrupt estate—is assisting a newly revived AAA Sports, the Atkins family and a new entity, i.e. New Wild Card, by making a grab for copyright and trademark rights that neither the estate nor the Atkins family/AAA Sports/New Wild Card possess because of abandonment, waiver, and misuse.

(Dkt. #124 at p. 20).  The actions described by Defendant in this paragraph, however, are not actions that give rise to a copyright misuse claim.  Moreover, as the Court discussed, AAA Sports is not the owner of the Copyrights, and the Trustee is not suing Defendant on behalf of AAA Sports.  The Estate has been the owner of the Copyrights since AAA Sports initiated bankruptcy proceedings in the 1990s.  Thus, AAA Sports' actions, as a third party to this case, are not relevant to any affirmative defense of copyright misuse.  Rather, it is the Trustee's actions taken on behalf of the Estate which guide this Court's decisions.  Accordingly, any argument with respect to the actions of AAA Sports is dead upon arrival.

The Trustee argues that the facts of this case do not give rise to a copyright misuse defense. According to the Trustee, he is merely attempting to enforce the Estate's exclusive rights over the Copyrights and nothing more.  As it relates to the Estate, Defendant counterargues that the copyright misuse defense is available for two reasons.  First, Defendant argues that the Trustee seeks to enforce elements of the Copyrights that are not protected by the certificates of registration. Second, Defendant argues that the Trustee is attempting to gain a monopoly over the name "Stat Smashers." The Court agrees with the Trustee.  The facts of this case do not give rise to an allegation of copyright misuse.

Copyright misuse is now widely recognized; however, it is still a relatively unexplored area of law.  Accordingly, the confines of the defense are not fully developed.  The cases in which courts have allowed a defendant to implement the copyright misuse defense almost exclusively involve claims where a "copyright owner's conduct rises to the level of (or is akin to) an antitrust violation," i.e., copyright owners who attempt to enlarge their monopoly by attaching conditions to the use of their copyrighted material.  11 *Copyright Misuse* § 118:68 (5th ed.); *see also* 2 *The Law of Copyright* § 16:2 ("[T]he behavior necessary to sustain the defense must go beyond that which is inherent in [the] copyright owner's protecting its exclusive rights" and "most often involves antitrust issues . . . ."); *Veeck*, 241 F.3d at 409 (holding that there was no genuine issue of material fact because "[t]he summary judgment record is devoid of evidence that the organization mandates the exclusive use of its codes or any of its other services when a governmental subdivision adopts one of the codes."); *Malibu Media, LLC v. Popp*, No. 1:14-CV-700, 2015 WL 10937405, at *3 (E.D. Va. Apr. 13, 2015) ("The Court holds that the copyright misuse affirmative defense is insufficient as a matter of law because Defendant fails to allege that Plaintiff engaged in any action to secure exclusive right to discourage competition."); *Video*

*Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 275 F. Supp. 2d 543, 558 (D.N.J. 2003) ("[T]he copyright misuse doctrine is appropriate where the copyright holder attempts to preclude its licensee, via clauses of their licensing agreement, from using or creating products that could compete with the copyrighted work.  That doctrine is inapplicable here, where no such anti-competitive clauses are at issue.").  Nonetheless, the thrust of the copyright misuse doctrine is more than just anticompetitive behavior; rather, it is behavior that violates public policy behind copyright law.  In *Lasercomb*, the Fourth Circuit deftly explains the public policy principle behind copyright misuse:

> While it is true that the attempted use of a copyright to violate antitrust law probably would give rise to a misuse of copyright defense, the converse is not necessarily true--a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action.  The question is not whether the copyright is being used in a manner violative of antitrust law (such as whether the licensing agreement is 'reasonable'), but *whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright*

*Id.* at 978.  Since *Lasercomb*, however, there has been little discussion regarding what specifically courts consider a violation of the public policy embedded in the grant of a copyright.

The seminal case in the Fifth Circuit with respect to copyright misuse is *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772 (5th Cir. 1999).  In *Alcatel*, the defendant accused the plaintiff of copyright misuse because the plaintiff only licensed its software (the copyrighted work) to be used only in conjunction with the plaintiff's hardware.  *Id.* at 793.  Accordingly, the defendant argued that the plaintiff indirectly sought "to obtain patent-like protection of its hardware—its microprocessor card—through the enforcement of its software copyright."  *Id.*  The jury agreed and found that the plaintiff had misused its software copyright.  *Id.*  However, the district court disagreed, ignoring the jury's finding and entering a permanent injunction in favor of the plaintiff.  *Id.*  On appeal, the Fifth Circuit held that the district court abused its discretion when it ignored the jury and entered a permanent injunction.  *Id.*  According to the Fifth Circuit, the evidence

adduced at trial was sufficient for the jury to find that the defendant "was effectively prevented from developing its product, thereby securing for [the plaintiff] a limited monopoly over its uncopyrighted microprocessor cards." *Id.* The relevant inquiry was whether the plaintiff used its copyright to effectively secure exclusive rights over separate works which were not copyrighted in violation of the public policy embedded in the grant of a copyright. *Id.*

Defendant cites *Alcatel* in support of its argument that the defense of copyright misuse applies because the Trustee seeks to enforce elements of the Copyrights that are not protected by the certificate of registration. *Alcatel* does not stand for that proposition. Rather, *Alcatel* dealt exclusively with whether a licensing agreement that restricted hardware not covered by a software copyright is sufficient to sustain a jury's finding of copyright misuse. *Id.* at 793–95. Defendant's argument, on the other hand, is based on a disagreement between the parties as to the scope of the Copyrights.

The thrust of Defendant's argument is that the Estate is liable for copyright misuse because the Trustee illegally expanded the scope of the Copyrights. Defendant bases this conclusion on its interpretation of the protectable elements of the Copyrights. Copyright misuse, though, is aimed at preventing a culpable plaintiff from prevailing in an action for copyright infringement. *Veeck*, 241 F.3d at 409; *see also* Defenses commonly arising in copyright litigation—Copyright misuse, Copyright Litigation Handbook § 13:29 (2d ed.) ("It is an "unclean hands" type of defense which forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant."). A plaintiff's misunderstanding of the scope of his or her copyright, on its own, is not culpable behavior. Defendant cites no analogous caselaw, and the Court can find none.

Although this is a developing area of law, the Court fails to see any interpretation of the copyright misuse defense in which this factual scenario could support copyright misuse.  Indeed, the standard in the Fifth Circuit seems to require more exacting culpable conduct.  In *Veeck*, for instance, the Fifth Circuit dismissed a copyright misuse defense on summary judgment because "[t]he summary judgment record [was] devoid of evidence that the organization mandates the exclusive use of its codes or any of its other services when a governmental subdivision adopts one of the codes."  241 F.3d at 409.  Given the absence of this type of evidence, the Fifth Circuit held that there was "no evidence of misuse that would prevent enforcement of [the plaintiff's] copyright."  *Id.*

The Trustee's behavior exhibits neither anticompetitive behavior nor a violation of the public policy embodied by copyright law.  On the contrary, this scenario is far outside the confines of copyright misuse.  Accordingly, in response to the Trustee's motion, Defendant did not cite to any evidence which would support the claim that the Estate misused the Copyrights to receive a competitive advantage and monopolize the field of sports trading cards.  Likewise, Defendant did not cite to any evidence which would support that parties' disagreement over the scope of a copyright's protectable elements contravenes public policy.  Because the Trustee pointed out a lack of evidence to support Defendant's claim that the Estate misused its copyrights and Defendant did not put forth particular facts indicating that there is a genuine issue for trial, Defendant did not meet its burden.  Thus, summary judgment in favor of the Trustee on Defendant's copyright misuse defense is warranted.

## CONCLUSION

It is therefore **ORDERED** that Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing (1) Lack of Standing, (2) Abandonment and Waiver, and

85

(3) No Damages (Dkt. #110) is hereby **DENIED**; Defendant Panini America, Inc's Motion for Summary Judgment Number Two: Addressing Alleged Copyright Infringement (Dkt. #111) is hereby **DENIED**; Defendant Panini America, Inc's Motion for Summary Judgment Number Three: Addressing Plaintiff's Count Two, the DMCA Claims (Dkt. #112) is hereby **DENIED**; Plaintiff's Motion for Partial Summary Judgment Regarding Plaintiff's Standing (Dkt. #115) is hereby **GRANTED**; and Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Affirmative Defenses (Dkt. #116) is hereby **GRANTED in part** and **DENIED in part**.

With respect to Defendant Panini America, Inc's Motion for Summary Judgment Number One: Addressing (1) Lack of Standing, (2) Abandonment and Waiver, and (3) No Damages (Dkt. #110), the parties agree that the Trustee is barred from pursuing statutory damages under the Copyright Act on behalf of the Estate.

With respect to Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Affirmative Defenses (Dkt. #116), the Court **DISMISSES** Defendant's affirmative defenses of abandonment by intent, abandonment by inaction, judicial estoppel, laches, and copyright misuse **WITH PREJUDICE**.  The issue of de minimis infringement remains for the jury.

**IT IS SO ORDERED.**

 **SIGNED this 27th day of July, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE